**UNDERWRITERS' LABORATORIES, Inc.,
v. COMMISSIONER OF INTERNAL
REVENUE.**

Nos. 8141, 8145.

Circuit Court of Appeals, Seventh Circuit.

May 7, 1943.

Thomas Watters, Jr., of New York City, Myron M. Cowen, of Washington, D. C., Jay C. Halls, of Chicago, Ill., Samuel H. Horne and Pressly R. Baldridge, both of Washington, D. C. (Watters, Cowen & Baldridge, of Washington, D. C., and Hopkins, Sutter, Halls & De Wolfe, of Chicago, Ill., of counsel), for petitioner.

Samuel O. Clark, Jr., Sewall Key, Irving I. Axelrod, and L. W. Post, Dept. of Justice, all of Washington, D. C., J. P. Wenchel and John T. Rogers, Bureau of Int. Rev., both of Washington, D. C., for respondent.

Before SPARKS, MAJOR, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

There are two appeals consolidated in this record, involving corporate income taxes of the petitioner for the years 1936, 1937 and 1938, and excess profits taxes for the year 1937. The questions presented here are:

1. Whether the taxpayer was exempt from income and excess profits taxes in the taxable years 1936, 1937 and 1938 because it was organized and operated exclusively for charitable, educational or scientific purposes within the provisions of Section 101 (6) of the Revenue Acts of 1936 and 1938, 26 U.S.C.A. Int.Rev.Code § 101(6).

2. Whether the taxpayer was exempt from income and excess profits taxes in the taxable years 1936, 1937 and 1938 as a business league within the provisions of Section 101(7) of the Revenue Acts of 1936 and 1938.[1]

Both questions were answered by the Board of Tax Appeals against the petitioner-taxpayer. The petitioner has appealed from that judgment, and the questions must be answered by us upon a determination of whether there is substantial evidence to support the Board's findings.

Whether the petitioner is a charitable, scientific or educational organization or whether it is a business league within the exemption of the statute are questions of ultimate fact to be found by the Board. Commissioner v. Chicago Graphic Arts, 7 Cir., 128 F.2d 424, 427. The Board found these facts against the petitioner.

The following facts are revealed by the record. In 1866 the National Board of Fire Underwriters, hereinafter referred to as the National Board, was organized by fire insurance companies to make investigations and to carry on research work as to insurance hazards and risks. The wider use of electricity for lighting purposes led in 1893 to further activity by the National Board in the study of the hazards and risks produced by this new invention, and to the formation in 1901 of a corporation in Illinois, known as the Underwriters' Laboratories of Illinois, hereinafter called the Illinois Company. The National Board financed this organization to the extent of three hundred thousand dollars. The Illinois Company conducted research and investigations as to insurance risks and hazards for the National Board until October 31, 1936, when the petitioner was organized as a Delaware corporation and acquired the assets and assumed the liabilities of the Illinois Company. At the time the petitioner took it over, the Illinois Company had assets of $1,156,019 and liabilities of $201,230. It had been a success financially and otherwise.

The petitioner is managed by fifteen trustees elected by the regular membership. The trustees, except two, are all officers of stock fire insurance companies. There are

---

[1] "Sec. 101. Exemptions from Tax on Corporations.

"The following organizations shall be exempt from taxation under this title—

\* \* \* \* \* \* \*

"(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

"(7) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual."

373

seventeen regular members, who control the petitioner, and ninety-one associate members, who have no voice in the management. The regular membership consists of the original incorporators, the National Board, and such officials of the National Board or any company member thereof as may be elected by the regular members. The National Board has as many votes as it had insurance companies belonging to it at its last annual meeting. All other regular members have one vote each. The petitioner is thus tightly controlled by the National Board, which is made up of insurance companies. They have a primary interest in the data accumulated by the petitioner in its investigations and research.

The petitioner is a non-profit corporation, and has never declared a dividend or attempted to divide its profits with its members. Its net income for 1937 was $183,339.01, and for 1938, $105,042.27. It is this income the petitioner claims to be exempt from taxation.

The petitioner conducts tests, experiments and investigations, as did the Illinois Company, into the causes of losses against which insurance companies insure. This information is furnished free to its members, regular and associate, most of whom are insurance companies or officers of insurance companies, and the data are also made available to a wider group of the general public through publications, movies, and the radio, all of which agencies of publicity extol the work and services of the petitioner.

The petitioner has a testing service which it offers only to manufacturers. The manufacturer's product is tested by the most modern methods of experimentation and scientific research, to determine its resistance to hazards and the part they may play in casualties usually insured against by insurance companies. If the manufacturer's product meets the petitioner's standards, it is publicized by petitioner as having done so, and petitioner's label is placed upon the manufacturer's product to indicate to the public that the goods have met the test. If the goods of the manufacturer do not meet the test, nothing is said or done about it. An ample fee is charged for the testing service, and the obligation to pay this fee does not depend upon the product passing the test. It is from these fees that the petitioner's income is almost entirely derived. The petitioner's trustees have the power to assess dues against its

members, but this has never been necessary because of the large profits the petitioner makes. The petitioner made refunds of $80,834 in 1937 and $25,303 in 1938 to its manufacturers who used its label service. Except in a very few instances, the testing service is rendered only to manufacturers. An individual purchaser of a piece of merchandise cannot get a test under any circumstances. In other words, the testing service is for the manufacturers who pay the ample fees that give the petitioner its large profits. As the Board observed: "Undoubtedly it could have established prices which would not have resulted in such substantial profits. Not having done so, it is reasonable to assume that it intended to operate for profit."

This does not sound like charity to us. If it is charity, it began at home. It was not the public interest that prompted the establishment of the petitioner. It was financial gain and business advantage. The primary concern of the petitioner was that of its membership, made up almost entirely of insurance companies, and the manufacturers who paid its ample fees. Whatever benefit inured to the public was only incidental to the primary concern. An institution that operates primarily for the benefit of private parties and only incidentally for the public is not a charitable institution in fact or within the meaning of the statute under consideration. Whatever benefit the public received was not as "a gift for public use" (Kain v. Gibboney, 101 U.S. 362, 365, 25 L.Ed. 813) but was to enable some one to sell something to the public by giving to the public something better than it otherwise would have received. That may be good business, but it is not charity.

Neither is the petitioner a scientific institution within the meaning of the statute. It did not operate on the basis of science for the sake of science. It was science for the sake of business. The fact that scientific methods were used by the petitioner does not alter the case. Most business today uses some kind of scientific processes or methods.

What we have said with reference to the charitable and scientific aspects of the case applies with equal force to the educational feature. It could hardly be claimed that this petitioner was organized and that it existed to educate the public. Education is not its business, except as an

incident to its main purpose to serve its members and give return to the manufacturers that use its service. The petitioner's business and not the public's education is primarily the purpose of the films, bulletins and other literature circulated by the petitioner. Education is used to further business, not business to further education.

 The Board found that the petitioner is a business league in form. That in and of itself does not entitle the petitioner to exemption. In Retailers Credit Ass'n. v. Commissioner, 9 Cir., 90 F.2d 47, 50, 111 A.L.R. 152, the court said: "There is no special significance to the words 'business League.' If the persons of an association have some common business interest, then the association is a 'business league.' The common business interest of the members of petitioner is the betterment of credit conditions. Therefore it is a business league. All business leagues are not exempt, however. Only those having particular purposes, which do not have the prohibited purposes, and which operate in the prescribed way are exempt."

The regulations promulgated by the Treasury Department provide that a business league to come within the exemption must not engage in a regular business normally carried on for profit.[2] This regulation is of long standing, and the section of the statute in question which it supplements and explains has been enacted by Congress many times since the regulation was adopted. The regulation has the sanction of Congress. The Department's interpretation of the statute through this regulation these many years gives it the quality of law. Retailers Credit Ass'n. v. Commissioner, 9 Cir., 90 F.2d 47, 50, 111 A.L.R. 152; Uniform Printing & Supply Co. v. Commissioner, 7 Cir., 33 F.2d 445. If the business the petitioner engaged in is of a kind ordinarily conducted for profit, although it be a business league in form, it is not exempt.

We know judicially that many business concerns conduct commercial testing laboratories for profit. The business in which the petitioner was engaged was a commercial testing laboratory, and of a kind usually conducted for profit, and is not exempt.

We think there was an abundance of evidence to support the Board's findings that the petitioner was not a charitable, educational or scientific institution or a business league entitled to exemption, and the decision of The Tax Court is affirmed.

---

[2] "Art. 101(7)-1. A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. * * *"