**NORTH CAROLINA ASSOCIATION OF INSURANCE AGENTS, INC., Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 83–1633.**

United States Court of Appeals, Fourth Circuit.

Argued April 3, 1984.

Decided July 18, 1984.

---

David I. Pincus, Tax Div., Dept. of Justice, Washington, D.C. (Michael L. Paup, Robert A. Bernstein, Tax Div., Dept. of Justice, Glenn L. Archer, Jr., Asst. Atty. Gen., Washington, D.C., Samuel T. Currin, U.S. Atty., Raleigh, N.C., on brief), for appellant.

William P. Daniell, Durham, N.C. (A. William Kennon, O. William Faison, Newsom, Graham, Hedrick, Bryson, Kennon & Faison, Durham, N.C., on brief), for appellee.

Before WINTER, Chief Judge, and WIDENER and PHILLIPS, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

In this income tax refund action, the United States appeals from summary judgment entered in favor of the taxpayer, the North Carolina Association of Insurance Agents, Inc. (NCAIA) on alternative grounds that taxpayer was a tax-exempt business league, or that if not, all of its taxable income was expended for deductible business expenses. We affirm in major part on the second alternative ground, but remand for recomputation of the appropriate amount of refund.

I

This action came before the district court on the parties' cross-motions for summary judgments on stipulated facts, the substance of which is as follows. The plaintiff NCAIA is a non-stock, non-membership corporation organized in 1965 under the then-effective North Carolina Nonprofit Corporation Act, 2B N.C.G.S. ch. 55A (1965). Its eighteen-member Board of Directors is elected by the Board of Directors of an affiliated non-profit membership corporation, Independent Insurance Agents of North Carolina, Inc. (IIANC); as a practical matter, the membership of the two boards coincides.[1]

NCAIA is a successor to an identically-named membership corporation organized in 1932. According to its original 1932 charter, NCAIA's corporate purpose was to promote the welfare of independent insurance agents generally, and to this end it undertook such activities as providing continuing education programs for insurance agents, pursuing public relations efforts aimed at improving the image of independent insurance agents, influencing insurance-related legislation at the state level, and regulating generally the professional activities of its members. The predecessor NCAIA received its income from dues, convention fees, tuition fees, and fees charged for servicing its group insurance program.

In 1951, the State of North Carolina determined to alter its method of fulfilling its insurance needs. Before that time, the state had been mainly self-insured, although a number of state agencies had obtained some coverage through local insurance agencies selected on a political patronage basis with resulting gaps and overlaps in coverage as well as poor service. State officials determined that the collective expertise and leverage of the NCAIA's members, as well as its not-for-profit character, particularly suited that organization for servicing the state's insurance requirements and they therefore solicited the NCAIA to act as the state's sole insurance agent of record. In 1952, NCAIA amended its charter to authorize it to act in such a capacity and, contemporaneously, the North Carolina General Assembly amended the General Statutes to provide that the Commissioner of Insurance would assume responsibility for satisfying all of the

1. In addition, the staffs of the two corporations are comprised of the same individuals.

state's insurance needs. The Commissioner then amended the North Carolina Administrative Code to provide that the NCAIA would act as the state's agent of record for these purposes.[2]

After amendment of the charter, NCAIA began to receive substantial commissions from the insurance policies it placed with private companies on the state's behalf. NCAIA was not allowed to use these receipts without restriction, however; as a condition of directing the state's business to NCAIA, the Commissioner of Insurance required, and the NCAIA agreed, that first 30%, and later 20%, of NCAIA's gross commissions[3] from the State Insurance Program would be donated to the Carolinas' Association of Mutual Insurance Agents, Inc. (CAMIA).[4] In addition, the Commissioner required that NCAIA use the remainder of its commission income, after subtracting expenses of carrying on the insurance program, to carry on fire and accident prevention programs, to provide scholarships, to support continuing education in the field of insurance, and to conduct other risk reduction programs.

Since the net proceeds from commissions were available to NCAIA only for restricted uses, corporate officers decided to form a separate corporation to service the state's business and to finance the activities required by the contract with the state. The current NCAIA was therefore organized in 1965 for the following corporate purposes:

1. To write insurance policies covering the needs and properties of the State of North Carolina on a commission basis.

2. To promote and assist educational programs and institutions generally and particularly in the fields of insurance, highway safety, fire and accident prevention, etc.

Concurrently, the former NCAIA changed its name to Independent Insurance Agents of North Carolina, Inc. (IIANC), which retained all corporate purposes of its predecessor except those specifically assumed by the new NCAIA.

Since 1965, the NCAIA has continued to service the state's insurance needs in the following manner. State agencies desiring insurance contact the North Carolina Department of Insurance for coverage of particular risks.[5] The Department then contacts the NCAIA, which determines whether the required coverage already exists.[6] If it does not, NCAIA arranges for coverage with one of the eighteen insurance carriers with which it has an agency contract. The carrier then quotes the cost of coverage and the NCAIA bills the purchasing state agency, sending the invoice to the Department of Insurance for approval. The Department forwards the invoice to the purchasing agency which remits payment to the NCAIA. Finally, NCAIA remits to the carriers the premiums net of its commissions, which range from 5–25% of

2. State law prohibits a state agency or department from placing insurance policies with private companies directly; state insurance must be placed through a licensed agent and a license may not be issued to one who serves only his employer. Currently, two NCAIA officers hold such licenses.

3. NCAIA currently receives these commissions from private insurance carriers with which it places the state's policies in accordance with the terms of its agency contracts.

4. CAMIA has now changed its name to the Carolinas' Association of Professional Insurance Agents and will hereinafter be referred to as CAPIA. CAPIA is a business league exempt from tax under I.R.C. § 501(c)(6).

5. NCAIA is not authorized to solicit insurance business from the state; it may only service the

state's requests for coverage of particular risks. Nevertheless, NCAIA's Insurance Advisory Committee, which has ultimate responsibility for supervision of the State Insurance Program, surveys the state's insurance needs and recommends to the various state agencies insurance programs sufficient to meet their needs. The Committee consists of six IIANC members who serve on a volunteer basis. Each year, two of these members also sit on NCAIA's Board of Directors.

6. NCAIA's staff performs the administrative tasks needed to process the State Insurance Program. NCAIA staff members are also on the staff of IIANC, but NCAIA reimburses IIANC for the use of its administrative personnel, facilities and for a reasonable allocation of overhead.

premiums paid, depending on the type of policy written.

Until 1974, NCAIA enjoyed tax-exempt status as a business league under I.R.C. § 501(c)(6).[7] In 1955, the Internal Revenue Service issued the original NCAIA a determination letter stating that NCAIA qualified for business league treatment and that commissions received under the State Insurance Program did not constitute unrelated trade or business income under I.R.C. § 513. In 1967, the IRS gave similar letters to IIANC and newly-formed NCAIA. In 1974, however, the IRS notified the NCAIA, but not IIANC, of proposed revocation of its exempt status because the State Insurance Program was not an exempt activity. The IRS made revocation final in 1976, advising NCAIA that it was required to file a corporate income tax return for tax years beginning on or after September 1, 1974.

In tax years ending August 31, 1975, August 31, 1976, and August 31, 1977, NCAIA filed corporate tax returns and paid taxes of $25,775.75, $6,857.93, and $13,097.67 respectively. On these returns, NCAIA deducted as ordinary and necessary business expenses all amounts paid to CAPIA and all its expenditures for educational and risk reduction programs. The Commissioner disallowed these deductions on audit and determined deficiencies of $38,316, $53,712, and $60,143, respectively, for the three years in question. NCAIA paid these deficiencies and after exhausting administrative remedies, filed this suit seeking refunds of the deficiency amounts and, since it claimed tax-exempt status, of the amounts originally paid with its returns.

On these stipulated facts, both the NCAIA and the Government filed motions for summary judgment. The magistrate to whom the motions were referred recommended, with one exception, that the court grant the Government's motion because the NCAIA did not have all of the necessary attributes of a tax-exempt business league and because NCAIA's outlays for educational expenses were not business related and were not, therefore, deductible. The magistrate, however, recommended that CAPIA payments be held deductible as they were a required condition of receiving the state's business under the agreement between NCAIA and the State.

The district court rejected the magistrate's recommendation and entered judgment for the plaintiff, holding that NCAIA was an exempt "business league" entitled to refund of all taxes paid. In the alternative, the court held that all amounts spent for educational and risk-reduction programs, as well as all payments to CAPIA, were ordinary and necessary business expenses deductible under I.R.C. § 162, and that since all of NCAIA's "income" had been spent on such programs, NCAIA was entitled to receive 100% of the refund sought. The Government appealed, assigning errors of law in both of these holdings.

## II

The Government first contends that the district court erred in holding that NCAIA was, during the three years in question, entitled to exemption from the income tax under I.R.C. § 501(c)(6) as a "business league." We agree.

## A

■ According to the long-accepted regulatory definition, a "business league" is:

[A]n association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines

---

7. I.R.C. § 501(c)(6) provides income tax exemption for:

Business leagues, chambers of commerce, real estate boards, boards of trade, or professional football leagues ..., not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league.

Treas.Reg. § 1.501(c)(6)–1 (1983). Having been left undisturbed despite numerous re-enactments of identically-worded predecessors to I.R.C. § 501(c)(6), this definition is deemed to have been given the imprimatur of Congress and is thus entitled to the effect of law. *Underwriters' Laboratories v. Commissioner*, 135 F.2d 371 (7th Cir. 1943).

■ Although the Government contended in the district court that NCAIA failed to meet this regulatory standard in every respect except the no-private-inurement requirement, it has narrowed its appellate challenge to this: because the NCAIA acts as the state's insurance agent, writing policies in much the same way as would any other insurance broker, it is "engage[d] in a regular business of a kind ordinarily conducted for profit," Treas.Reg. § 1–501(c)(6)–1, and is therefore ineligible for business league treatment.

In support, the Government analogizes to a number of cases including *Associated Master Barbers & Beauticians of America, Inc. v. Commissioner*, 69 T.C. 53 (1977). The *Master Barbers* taxpayer was a non-profit membership corporation organized to promote the interests of barbers generally. The association performed a number of tasks aimed at achieving this end, including publication of a monthly magazine, a standard textbook for barbers, and a styling book, and sending representative teams to various conventions on hairstyling. But the association also instituted an extensive self-insurance program for the majority of its members, providing coverage for hospitalization and death. Receipts and disbursements from insurance-related activities ranged between 30–40% of the organization's total receipts and dis-

bursements, and staff employees spent between 10–15% of their time administering the insurance programs. The Tax Court held that:

> [T]he evidence clearly demonstrates that petitioner was engaged in a regular business of a kind ordinarily carried on for profit during all the taxable years in question. Its officers and employees were involved on a daily basis with recordkeeping, processing claims for benefits, paying claims, and performing other administrative duties in connection with such insurance activities. As we see it, the petitioner was engaging in an insurance business—a business of the type which is ordinarily carried on for profit.

69 T.C. at 65–66. *Cf. Underwriters' Laboratories, Inc. v. Commissioner*, 135 F.2d 371 (7th Cir.1943) (corporation organized by fire insurance companies to investigate causes of fire loss not entitled to business league exemption because it provided lab services for members in return for fees); *Retailers Credit Association v. Commissioner*, 90 F.2d 47 (9th Cir.1937) (credit reporting and collection services held non-exempt); *Southern Hardwood Traffic Association v. United States*, 283 F.Supp. 1013 (W.D.Tenn.1968), *aff'd*, 411 F.2d 563 (6th Cir.1969) (collecting freight claims and transit refunds on a commission basis).

NCAIA argues to the contrary that a number of factors place its insurance activities outside the category of "businesses of the type ordinarily carried out for profit." First, as is concededly true, NCAIA is the *sole* insurance agent of record for the State of North Carolina. Second, state law, at least as it has now evolved, bars other organizations from entering the market for the state's business. Finally, the State of North Carolina has, because of institutional problems arising from its earlier practice of allowing insurance agents to vie by political lobbying for its business, restricted to a narrow field the *type*, as opposed to the *identity*, of agencies with whom it will deal. These are agencies which have significant leverage within the insurance industry generally, which demonstrate the

expertise necessary to develop a program of insurance of sufficient breadth to cover all of the state's insurance needs, and, perhaps most importantly, which will do so in such a way that no portion of the profits derived will redound to the benefit of private individuals. These factors combine, NCAIA argues, to make its method of delivering insurance services to the state utterly unique, so that its business cannot be of a kind "ordinarily" conducted for profit.

NCAIA's conceptual argument, that an organization's arguably "business" activity may, by virtue of its absolute uniqueness, distinguish itself for I.R.C. § 501(c)(6) purposes from business "ordinarily" carried on for profit, finds some support in the tax court's decision in *MIB, Inc. v. Commissioner*, 80 T.C. 438 (1983), *rev'd on other grounds*, 734 F.2d 71 (1st Cir.1984), finding tax exempt a not-for-profit life insurance industry organization that operated a cooperative service for exchange of confidential underwriting information aimed at reducing the incidence of life insurance fraud. The petitioner in *MIB*, however, provided a service completely unattempted by any profit-seeking businesses, namely, that of acting as a depository and information clearinghouse for all of its member ship, which represented 98% of all United States insurance carriers. In fact, the court expressly found that it had "no basis for concluding that a for-profit business *would* or *could* perform a function similar to petitioner's information exchange if petitioner ceased its operations." 80 T.C. at 455 (emphasis added).[8]

There is, however, a solid basis for so concluding on the stipulated facts in this case. Before 1952, for-profit insurance

agencies not only "could" have placed insurance for the state, but in fact did so. Thus, while in an appropriate case, the *MIB* "uniqueness" rationale might support a conclusion of tax exempt business league status, this is not such a case. Here, although the taxpayer has no current competition in the marketplace, it is clear that for-profit businesses currently in operation "would" and "could" perform functions similar to NCAIA if, for whatever reason, it "ceased its operations." *See Jockey Club v. United States*, 137 F.Supp. 419, 422, 133 Ct.Cl. 787, *cert. denied*, 352 U.S. 834, 77 S.Ct. 52, 1 L.Ed.2d 54 (1956) (petitioner's activities were such that "if the plaintiff did not cover the field, [they] would quite certainly be undertaken by some one as a business activity with a view to making a profit"). We are therefore persuaded by the cases cited by the Government and hold that NCAIA's business is "of a kind ordinarily carried on for profit."[9]

### B

Despite the foregoing conclusion, NCAIA might nonetheless prevail if the revenues generated by its insurance activities were "incidental" to performance of its tax-exempt purposes. *Associated Master Barbers & Beauticians v. Commissioner*, 69 T.C. 53, 67 (1977); *Evanston-North Shore Board of Realtors v. United States*, 320 F.2d 375, 162 Ct.Cl. 682 (1963). Resolution of the question whether they are so incidental depends critically upon choice of an appropriate standard of "incidentalness."

**8.** The First Circuit recently reversed the tax court's decision in *MIB*, though on different grounds. The court held that MIB's activities were directed primarily toward "performance of services for individual" members, thus excepting it from business league status under Treas. Reg. § 1.501(c)(6)–1. The court declined, however, to address the Commissioner's argument that MIB was engaged in a "kind of business ordinarily carried on for profit" in violation of the 501(c)(6) regulations.

**9.** NCAIA relies on *King County Insurance Association v. Commissioner*, 37 B.T.A. 288 (1938), *acq.*, 1938–1 C.B. 17, and *Independent Insurance Agents of Northern Nevada, Inc. v. United States*, 44 A.F.T.R.2d (P–H) 5880 (D.Nev.1979), as authority supporting its argument that the State Insurance Program is not a business ordinarily engaged in for profit. *Independent* is easily distinguished in several important respects, but as to *King County*, we think the best course is simply to acknowledge its irreconcilability with our view of current law.

The Government urges that the "incidentalness" of a business activity should be measured in terms of its financial significance, e.g., its proportional contribution to the organization's total revenues, a view having substantial support in the cases. *See, e.g., Indiana Retail Hardware Association, Inc. v. United States,* 366 F.2d 998, 177 Ct.Cl. 288 (1966) (business activities not incidental where they contributed 58–60% of organization's revenues). Additionally, the Government argues, the proportional amount of staff time devoted to the particular business activity should be considered. *See Associated Master Barbers & Beauticians of America v. United States,* 69 T.C. at 67–69; *Southern Hardwood Traffic Association v. United States,* 283 F.Supp. 1013, 1018–19 (W.D.Tenn.1968), *aff'd.,* 411 F.2d 563 (6th Cir.1969).

The NCAIA, by contrast, contends that "incidentalness" should be determined by examining the *functional* relationship between the particular business activity and the tax-exempt purpose sought to be advanced. *See, e.g., American Institute of Interior Designers v. United States,* 208 F.Supp. 201 (N.D.Cal.1962); *Texas Mobile Home Association v. Commissioner,* 324 F.2d 691 (5th Cir.1963). In this regard, NCAIA argues that, despite their revenue-generating quality, its insurance activities are primarily aimed at elevating the public's opinion of independent insurance agents by replacing a practice that subjected their industry to substantial criticism, *i.e.,* that of political patronage-based parcelling out of the state's insurance business.

In the final analysis, we believe that neither the government's nor the NCAIA's test provides an exclusively dispositive standard against which incidentalness may be measured. Rather, this determination must be made by considering the totality of the facts and circumstances including the business activity's financial impact, its proportional requirements of staff time, and the directness of its functional relationship to a tax-exempt purpose.

■ Applying this test to the facts stipulated, we conclude that although there is a plausible functional relationship between one of NCAIA's tax-exempt purposes and the State Insurance Program, the more compelling consideration is that the Insurance Program indisputably supplies between 95–98% of the organization's gross revenues and its administration occupies approximately 60% of its employees' time. These factors compel us to hold that the NCAIA's non-exempt business activity is not incidental to its exempt activities.[10]

On this basis, we conclude that the district court erred in holding that the NCAIA was, during the tax years in question, a tax-exempt business league under I.R.C. § 501(c)(6).

### III

The district court held alternatively that if NCAIA was not entitled to tax-exempt status, it was nevertheless entitled to deduct, as "ordinary and necessary business" expenses, all payments made to CAPIA and all funds expended for educational and risk reduction programs. The government challenges this holding; but we affirm it in basic principle.

The government's challenge is two-fold. First, it argues that even though the state required commissions derived from the State Insurance Program to be devoted to these objects, the origin and nature of these expenses bears no meaningful relationship to the actual conduct of the State Insurance Program and thus both types of payments are non-deductible. Second,

---

10. Nothing we have said to this point is altered by the fact that the NCAIA devotes all of its "income" to financing tax-exempt activities. This court has repudiated the destination-of-income doctrine. *E.g., United States v. Community Services, Inc.,* 189 F.2d 421 (4th Cir.1951), *cert. denied,* 342 U.S. 932, 72 S.Ct. 375, 96 L.Ed. 694 (1952). Nevertheless, we are not persuaded by the government's argument that NCAIA's claimed exemption is barred by I.R.C. § 502, *i.e.,* that NCAIA is the equivalent of a non-exempt feeder organization, since not "all of [NCAIA's] profits are payable to one or more organizations exempt from taxation" under I.R.C. § 501.

since NCAIA's contractual agreement with the state in effect requires no more than that it spend earned commissions in accordance with its corporate charter, NCAIA's promise does not supply legal consideration sufficient to support an enforceable contract or a corresponding business deduction.

■ As the government correctly notes, the simple fact that a payment is contractually required does not render it deductible as a business expense. *See Virginia National Bank v. United States*, 450 F.2d 1155, 1158 (4th Cir.1971); *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 594, 63 S.Ct. 1279, 1282, 87 L.Ed. 1607 (1943). For example, installment payments made to retire the principal of long-term debt would not be deductible under I.R.C. § 162 despite such a payment's being required by the loan agreement. Neither would amounts of dividends paid to stockholders, although contractually-required as a condition of making certain contributions to capital. But where, as here, a specified payment is made, whether to the contract promisee or to a third-party beneficiary, pursuant to a contract provision making such payments a bona fide condition to the receipt of income-generating sales, such a payment is deductible as a business expense.

■ Contrary to the government's argument, the stipulated facts indicate that the State of North Carolina's requirement that NCAIA pay CAPIA 20% of its gross commissions and that it spend the balance of its income on educational and risk reduction programs was a real condition precedent to receipt of its insurance business. Far from being illusory, this condition served a manifestly reasonable interest of the state: that of ensuring that whomever served as the state's insurance agent would do so on a not-for-profit, rather than a political patronage basis. The facts of record thus disclose a bona fide, non-illusory requirement having "some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for

such an arrangement." *Kalamazoo Oil Co. v. Commissioner*, 693 F.2d 618, 621 (6th Cir.1982) (citations omitted).

We are also unpersuaded by the government's second argument, namely, that since the State Insurance Program contract requires that NCAIA do no more than spend its revenues in accordance with its own charter, NCAIA's promise is not legally detrimental and thus the contract fails for lack of consideration. Since the contract was therefore not legally enforceable, the argument goes, amounts "gratuitously" paid to CAPIA or in pursuit of various programs are not deductible. This argument fails on two counts. First, NCAIA's corporate charter clearly does not require it to donate funds to CAPIA. Left to its own devices, NCAIA would be free to spend these funds to finance its own educational programs, a result it might well deem desirable. Second, all corporate charters require funds to be spent in furtherance of some corporate goal; a corporation may not enter into a contract requiring it to perform ultra vires duties. The fact that NCAIA's contract with the state does not require it to spend earnings in ways *not* authorized by its charter does not support the view that required payments are any less than "ordinary and necessary."

Finally, although NCAIA might suffer other non-tax consequences from doing so, it is clearly free to amend its corporate charter to allow funds to be spent in ways not required by its contract with the state.

### IV

Although we affirm the district court's alternative holding that NCAIA's expenditures for educational and risk-reduction programs and its payments to CAPIA were deductible as ordinary business expenses, the district court's monetary judgment does not accurately reflect that precise holding. Instead it reflected deductibility of the entire amount of NCAIA's income for each of the tax years 1975, 1976 and 1977, although in each of those years the amount of taxable income was—as NCAIA concedes—greater than the amount allowa-

ble as deductible business expense under the alternative holding we affirm.

Accordingly, we vacate the judgment and remand to allow recomputation of the appropriate tax refund and entry of judgment consistent with this opinion.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.