**CREDIT UNION INSURANCE CORPORATION, Plaintiff–Appellee,**

v.

**UNITED STATES of America, Defendant–Appellant.**

**No. 95–2267.**

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1996.

Decided June 18, 1996.

---

**ARGUED:** Kenneth Larry Greene, Tax Division, United States Department of Justice, Washington, DC, for Appellant. Roger D. Redden, Piper & Marbury, L.L.P., Baltimore, Maryland, for Appellee. **ON BRIEF:** Loretta C. Argrett, Assistant Attorney General, Gary R. Allen, Curtis C. Pett, Lynne Ann Battaglia, United States Attorney, Tax Division, United States Department of Justice, Washington, DC, for Appellant. Joseph H. Langhirt, Martin E. Wolf, Piper & Marbury, L.L.P., Baltimore, MD, for Appellee.

**1328**

Before RUSSELL and ERVIN, Circuit Judges, and NORTON, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge RUSSELL wrote the opinion, in which Judge ERVIN and Judge NORTON joined.

## OPINION

DONALD S. RUSSELL, Circuit Judge:

In this case, we must determine whether Credit Union Insurance Corporation ("CUIC") is entitled to exemption from federal income tax.

CUIC was chartered in 1974 by an act of the Maryland General Assembly as a non-profit, non-stock corporation, the members of which are credit unions that apply for, and are accepted for, membership. Md.Fin.Inst. Code Ann. § 7–101, et seq. (1992). CUIC insures and guarantees the share and deposit accounts of member credit unions. Md.Fin. Inst.Code Ann. § 7–103(1). Member credit unions pay to and maintain with CUIC a deposit equal to one percent of the credit union's insured shares. CUIC invests the deposited funds and accumulates the investment earnings. No investment earnings are returned to the member credit unions. In addition to providing insurance, CUIC regularly reviews the financial conditions of its member credit unions and may take action to strengthen the financial condition or enhance the liquidity of a member credit union.

At the time of CUIC's formation, the Internal Revenue Service ("IRS") granted CUIC tax-exempt status as a "business league" under 26 U.S.C. § 501(c)(6). On November 7, 1983, however, the IRS issued Revenue Ruling 83–166, which determined that 26 U.S.C. § 501(c)(14)(B) covers corporations, like CUIC, which insure deposits in credit unions. Section 501(c)(14)(B) exempts non-profit, nonstock corporations that insure deposits in domestic building and loan associations, cooperative banks, and mutual savings banks, but only if the corporation was organized before September 1, 1957. Although § 501(c)(14)(B) does not mention insurers of credit unions, the IRS determined in Revenue Ruling 83–166 that the section also ap-

plies to insurers of credit unions because the IRS has historically considered credit unions to be within the general meaning of "cooperative banks." Revenue Ruling 83–166, 1983–2 C.B. 96, 97. Thus, the IRS determined that 26 U.S.C. § 501(c)(14)(B) exempted insurers of credit unions only if they were organized before September 1, 1957. *Id.* Furthermore, because § 501(c)(14)(B) was a specific provision establishing the tax status of insurers of deposits in credit unions, the IRS also determined that such corporations were not entitled to qualify for exemption under a more general provision, such as the "business league" exemption under § 501(c)(6). *Id.* The effect of Revenue Ruling 83–166 was to terminate CUIC's tax-exempt status.

Because Revenue Ruling 83–166 applied prospectively to taxable years beginning after November 7, 1983, CUIC began paying federal income tax in 1984. CUIC has filed a claim for refund in each year between 1984 and 1992 in which it paid taxes. CUIC tried to challenge the revocation of its tax-exempt status through administrative channels. After exhausting its administrative remedies, CUIC filed this tax refund suit. The district court granted summary judgment in favor of CUIC, holding that CUIC is exempt from federal tax as a "business league" under § 501(c)(6), and that § 501(c)(14)(B) is inapplicable to insurers of credit unions. We agree.

### I.

Section 501(c)(14) of the Internal Revenue Code grants a federal tax exemption to:

(A) Credit unions without capital stock organized and operated for mutual purposes and without profit.

(B) Corporations or associations without capital stock organized before September 1, 1957, and operated for mutual purposes and without profit for the purpose of providing reserve funds for, and insurance of shares or deposits in—

(i) domestic building and loan associations,

(ii) cooperative banks without capital stock organized and operated for mutual purposes and without profit,

(iii) mutual savings banks not having capital stock represented by shares, or

(iv) mutual savings banks described in section 591(b).

26 U.S.C. § 501(c)(14).

The plain language of the statute reveals that Congress has not defined the tax-exempt status of corporations that insure the deposits in credit unions. Section 501(c)(14)(B) expressly grants tax-exempt status to corporations *organized before September 1, 1957* that insure the deposits in domestic building and loan associations, cooperative banks, and mutual savings banks. The provision says nothing about corporations that insure deposits of credit unions. We cannot assume that Congress intended the provision for insurers of "cooperative banks" to include insurers of credit unions, because Congress' use of the term "credit unions" in § 501(c)(14)(A) reveals that Congress understood the term to mean something distinct from "cooperative banks," "building and loan associations," and "mutual savings banks." Consequently, § 501(c)(14)(B) does not clarify whether Congress intended to grant tax-exempt status to all such corporations, to grant tax-exempt status to only those corporations organized before September 1, 1957, or to deny tax-exempt status to all such corporations.

We turn to the legislative history of § 501(c)(14), which explains why Congress remained silent on the tax status of corporations that insure deposits in credit unions.

### A.

Prior to 1951, the Internal Revenue Code granted tax-exempt status to domestic building and loan associations, cooperative banks, and mutual savings banks. Section 101 of the Internal Revenue Code of 1939 (the "1939 Code") provided, in relevant part:

The following organizations shall be exempt from taxation under this chapter—

(2) Mutual savings banks not having capital stock represented by shares. . . .

(4) Domestic building and loan associations substantially all the business of which is confined to making loans to members; and cooperative banks without capital stock organized and operated for mutual purposes and without profit. . . .

Although neither § 101(2) nor § 101(4) expressly exempted credit unions from federal tax, the IRS granted tax-exempt status to credit unions by regulation:

Cooperative banks without capital stock organized and operated for mutual purposes and without profit are exempt. Credit unions such as those organized under the law of Massachusetts, being in substance and in fact the same as cooperative banks, are likewise exempt from tax.

Treas.Reg. § 29.101(4)–1 (1951).

Similarly, neither § 101(2) nor § 101(4) expressly exempted corporations that insured the deposits of building and loan associations, cooperative banks, and mutual savings banks. Nevertheless, the IRS treated these insuring organizations as exempt under § 101(2) and § 101(4). *See* S.Rep. No. 1034, 86th Cong., 2d Sess. 1–2 (1960), *reprinted in* 1960 U.S.C.C.A.N. 1873, 1873–74.

In 1951, Congress revoked the tax-exempt status of domestic building and loan associations, cooperative banks, and mutual savings banks. Congress eliminated the exemption for mutual savings banks by repealing § 101(2), and it eliminated the exemption for building and loan associations and cooperative banks by amending § 101(4) to grant an exemption only to the following institutions:

Credit unions without capital stock organized and operated for mutual purposes and without profit; and corporations or associations without capital stock organized prior to September 1, 1951, and operated for mutual purposes and without profit for the purposes of providing reserve funds for, and insurance of, share or deposits in—

(A) domestic building and loan associations,

(B) cooperative banks without capital stock organized and operated for mutual purposes and without profit, or

(C) mutual savings banks not having capital stock represented by shares.... Revenue Act of 1951, ch. 521, § 313, 65 Stat. 452, 490 (1951). This amendment to § 101(4) is the predecessor statute to § 501(c)(14) of the current Internal Revenue Code.

The legislative history of the Revenue Act of 1951 reveals that Congress eliminated the tax exemption for building and loan associations, cooperative banks, and mutual savings banks because they actively compete with taxable institutions, such as commercial banks and life insurance companies, for the public savings and in the securities and real estate markets. S.Rep. No. 781, 82d Cong., 1st Sess. 23–29 (1951), *reprinted in* 1951 U.S.C.C.A.N. 1969, 1991–97. Eliminating their tax exemption placed building and loan associations, cooperative banks, and mutual savings banks on a level playing field with their competitors. *Id.* With respect to building and loan associations (and cooperative banks) in particular, Congress stated that they are "no longer self-contained cooperative institutions as they were when originally organized" and that "there is relatively little difference between their operations and those of other financial institutions which accept deposits and make real-estate loans." 1951 U.S.C.C.A.N. at 1996.

In amending § 101(4), Congress, for the first time, expressly granted a tax exemption to credit unions. However, the legislative history does not explain why Congress retained the tax exemption for credit unions but revoked the exemption for building and loan associations, cooperative banks, and mutual savings banks. We know only that Congress, for some reason, decided to treat credit unions as different from these other institutions.

Congress also amended § 101(4) to expressly grant a tax exemption for corporations that insure deposits in building and loan associations, cooperative banks, or mutual savings banks, but it restricted the exemption only to those corporations organized before September 1, 1951. At the time of the enactment of the Revenue Act of 1951, only four such organizations were in existence: two in Massachusetts, one in Connecticut, and one in New Hampshire. S.Rep. No.

1034, 86th Cong., 2d Sess. 2–3 (1960), *reprinted in* 1960 U.S.C.C.A.N. 1873, 1874–75. These organizations provided a deposit insurance fund and a liquidity fund for their members, which were either building and loan associations or mutual savings banks. 1960 U.S.C.C.A.N. at 1874. The two Massachusetts organizations drafted the amendment to § 101(4), and they included the September 1, 1951, date restriction solely so that they could represent to Congress that the revenue effects would be limited to only four organizations. *Id.* at 1875. In 1960, Congress changed the cut-off date to September 1, 1957, so that it could grant the same exemption to another mutual deposit guarantee fund that was organized in Ohio after September 1, 1951. *Id.* at 1874; Act of April 22, 1960, Pub.L. No. 86–428, 74 Stat. 54 (1960).

When Congress amended § 101(4) in 1951, there was no organization in existence that insured the deposits of credit unions. Consequently, the Massachusetts organizations that drafted the amendment to § 101(4) did not need to include an exemption for insurers of credit unions. Congress remained silent on the tax status of corporations that insure deposits in credit unions because it had no reason to decide that issue.

### B.

Despite Congress' silence on the tax status of insurers of credit unions, the IRS for many years granted an exemption to insurers of credit unions, regardless of their date of incorporation. The plaintiff placed unrebutted evidence in the record demonstrating that the IRS, on January 21, 1965, granted an exemption to the Massachusetts Credit Union Share Insurance Corporation ("MCUSIC") under § 501(c)(14), despite the fact that it was formed in 1961. The IRS did not indicate the particular subsection of § 501(c)(14) that entitled MCUSIC to the exemption, but because MCUSIC was organized after September 1, 1957, it could not have qualified for the exemption as an insurer of cooperative banks under § 501(c)(14)(B). Thus, the IRS must have assumed that insurers of credit unions were entitled to tax-exempt status under the ex-

press exemption for credit unions in § 501(c)(14)(A).

Meanwhile, the Maryland Savings–Share Insurance Corporation ("MSSIC"), an insurer of deposits in savings and loan associations, could not receive an exemption because it was chartered in 1962, after the September 1, 1957 cut-off date in § 501(c)(14)(B). MSSIC lobbied Congress to pass legislation that would have moved the cut-off date forward to January 1, 1963. The bill passed the House of Representatives, but it was never reported out of the Senate Finance Committee, which concluded that "continued forward movement of the date might lead to proliferation of state insurers that could hinder the operations and threaten the financial stability of the Federal Deposit Insurance Corporation and the Federal Savings and Loan Insurance Corporation." *United States v. Maryland Savings–Share Ins. Corp.*, 400 U.S. 4, 5–6, 91 S.Ct. 16, 17, 27 L.Ed.2d 4 (1970) (citing Hearing on H.R. 3297 before the Senate Committee on Finance, 88th Cong., 2d Sess. 9–10 (1964)).\* Congress' refusal to grant an exemption to MSSIC did not stop the IRS from subsequently granting an exemption to MCUSIC, the insurer of credit unions, under § 501(c)(14).

At some point, the IRS decided to exempt insurers of credit unions as "business leagues" under § 501(c)(6), instead of under the exemption for credit unions in § 501(c)(14). On May 8, 1979, the IRS notified the Massachusetts Credit Union Share Insurance Corporation that the IRS had changed the statutory basis of its exemption from § 501(c)(14) to § 501(c)(6). The IRS explained:

> This action is taken because an organization of your type, formed by the State legislature to insure against the insolvency or financial difficulty of member credit unions comes within the definition of Section 501(c)(6) of the Internal Revenue Code

rather than Internal Revenue Code section 501(c)(14) which applies to Credit unions organized without capital stock, operated for mutual purposes and without profit.

J.A. 49 (Letter from IRS to MCUSIC, May 8, 1979). Thus, the IRS recognized that § 501(c)(14)(A) exempted only credit unions and that the express language of § 501(c)(14) did not determine the tax status of insurers of credit unions. The "business league" exemption under § 501(c)(6) provided a convenient way to continue the exemption for insurers of credit unions without having to rely on an interpretation of § 501(c)(14).

### C.

The IRS reversed its position in Revenue Ruling 83–166, 1983–2 C.B. 96. In that ruling, the IRS held that § 501(c)(14)(B) applies to insurers of credit unions because the IRS has historically considered credit unions to be within the general meaning of "cooperative banks." *Id.* at 97. Between 1939 and 1951, § 101(4) of the Internal Revenue Code, the predecessor to § 501(c)(14), did not expressly exempt credit unions from federal tax. During this time period, however, the IRS considered credit unions to be within the meaning of "cooperative banks" and granted tax-exempt status to credit unions under the express exemption for cooperative banks. In Revenue Ruling 83–166, the IRS reasoned from this past practice that the term "cooperative banks" in § 501(c)(14)(B) of the current code includes credit unions. *Id.* Thus, the IRS concluded that insurers of credit unions, although not expressly included in § 501(c)(14)(B), receive tax-exempt status because that provision expressly grants an exemption to insurers of cooperative banks. Because § 501(c)(14)(B) exempts only insurers of cooperative banks organized before September 1, 1957, the IRS concluded that the same date restriction applies to insurers of credit unions.

---

\* After Congress' failure to extend the cut-off date, MSSIC filed suit in the District of Maryland, arguing that § 501(c)(14)(B) was unconstitutional because it arbitrarily discriminated between MSSIC and other nonprofit, mutual insurers that happened to be organized before September 1, 1957. After the district court invalidated § 501(c)(14)(B), the Supreme Court took a direct appeal and reversed, holding that "Congress does not exceed its power to tax nor does it violate the Fifth Amendment when it refuses to exempt from tax newly formed corporations, the multiplication of which might burden otherwise valid federal programs." *United States v. Maryland Savings–Share Ins. Corp.*, 400 U.S. 4, 6–7, 91 S.Ct. 16, 18, 27 L.Ed.2d 4 (1970).

■ We need not blindly accept the IRS's construction of § 501(c)(14)(B), as expressed in Revenue Ruling 83–166. Normally, when construing a statute that is silent or ambiguous with respect to a specific issue, courts defer to the reasonable interpretation of the agency charged with administering the statute. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). However, we accord much less deference to an agency's interpretations of a statute that conflict with the agency's previous interpretations of that same statute. *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 698, 111 S.Ct. 2524, 2534–35, 115 L.Ed.2d 604 (1991); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987); *Hanauer v. Reich*, 82 F.3d 1304, 1311 n. 4 (4th Cir. 1996). Because Revenue Ruling 83–166 represents a sharp break from the IRS's prior interpretation of § 501(c)(14)(B), we review the IRS's construction of the statute with greater scrutiny.

We find that several considerations undermine the IRS's reasoning in Revenue Ruling 83–166. First, employing the logic used by the IRS in Revenue Ruling 83–166, we should also conclude that § 501(c)(14) grants an exemption to all insurers of credit unions, regardless of their date of organization. Between 1939 and 1951, § 101(2) and § 101(4) of the Internal Revenue Code did not expressly exempt insurers of building and loan associations, cooperative banks, and mutual savings banks from federal tax, but during this time period the IRS, by regulation, granted tax-exempt status to these insurers under the express exemption for the institutions that they insured. Because the IRS has historically granted tax-exempt status to the insurers of financial institutions that receive an exemption from tax, the IRS should have inferred from Congress' express grant of a tax exemption to credit unions in § 501(c)(14)(A) an implicit exemption for insurers of credit unions.

Second, the legislative history of the Act of April 22, 1960, Pub.L. No. 86–428, 74 Stat. 54 (1960) (the "1960 Act"), demonstrates that Congress did not consider insurers of credit unions to be covered under § 501(c)(14)(B). In the 1960 Act, Congress amended the cutoff date in § 501(c)(14)(B) from September 1, 1951, to September 1, 1957. Congress enacted the 1960 Act at the behest of a mutual deposit guarantee fund that was organized in Ohio after September 1, 1951. The Ohio organization wanted the same exemption that other mutual deposit guarantee funds received simply because they were organized before September 1, 1951. The legislative history to the 1960 Act clearly states Congress' understanding that the change to § 501(c)(14)(B) would affect only one organization, the Ohio mutual deposit guarantee fund. S.Rep. No. 1034, 86th Cong., 2d Sess. 2–3 (1960), *reprinted in* 1960 U.S.C.C.A.N. 1873, 1874–75. However, the Credit Union Share Guaranty Corporation ("CUSGC") was formed in Illinois on January 16, 1956, as the first organization in the United States to insure the deposits in credit unions. If Congress had thought that § 501(c)(14)(B) applied to insurers of credit unions, it would have recognized that the 1960 Act would have granted tax-exempt status to CUSGC. The fact that the legislative history to the 1960 Act made no mention of CUSGC demonstrates Congress' understanding that § 501(c)(14)(B) did not apply to insurers of credit unions.

Third, and most important, the IRS's assumption that the term "cooperative banks" include credit unions ignores the fact that Congress specifically utilized the term "credit unions" in § 501(c)(14). Under the plain language of § 501(c)(14), Congress intended to grant a tax exemption for credit unions, while denying the very same exemption to cooperative banks, building and loan associations, and mutual savings banks. It intended credit unions to receive a different tax treatment than cooperative banks. Because Congress clearly distinguished between "credit unions" and "cooperative banks," we cannot reasonably conclude that the provision for insurers of cooperative banks in § 501(c)(14)(B) also covers insurers of credit unions.

We therefore reject the IRS's conclusion in Revenue Ruling 83–166 that § 501(c)(14)(B) governs the tax status of insurers of credit

unions. In so holding, however, we do not substitute our own interpretation of § 501(c)(14). It appears that the IRS, for many years, exempted insurers of credit unions under the express exemption for credit unions in § 501(c)(14)(A). Had the IRS adhered to that view, we would have shown deference to this reasonable interpretation of the statute. Because the IRS has abandoned that view, we resist the temptation to impose that interpretation on our own. Instead, we continue to operate on the assumption that Congress made no express provision in § 501(c)(14) regarding that tax status of insurers of credit unions.

### D.

■ It is a basic principle of statutory construction that a specific statute controls over a general provision, particularly when the two are interrelated and closely positioned. *HCSC–Laundry v. United States,* 450 U.S. 1, 6, 101 S.Ct. 836, 838–39, 67 L.Ed.2d 1 (1981). In Revenue Ruling 83–166, the IRS concluded that CUIC could not qualify for an exemption as a "business league" under § 501(c)(6) because it did not qualify for an exemption under § 501(c)(14), a more specific statute governing the tax status of insurers of credit unions. In light of our holding that Congress made no provision governing the tax status of insurers of credit unions in § 501(c)(14), we conclude that § 501(c)(14) is not a more specific statute than § 501(c)(6) for purposes of determining CUIC's tax status.

Therefore, we conclude that the principle of statutory construction articulated in *HCSC–Laundry* does not prevent us from considering whether CUIC is entitled to an exemption from tax as a "business league" under § 501(c)(6).

### II.

■ Section 501(c)(6) grants an exemption from federal tax to the following:

Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefits of any private shareholder or individual.

26 U.S.C. § 501(c)(6). The IRS has defined "business league" as follows:

A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self sustaining, is not a business league.

26 C.F.R. § 1.501(c)(6)–1. Because Congress has not changed this definition of "business league" despite several reenactments of identically-worded predecessors to § 501(c)(6), we deem that the definition has the imprimatur of Congress and give it the effect of law. *North Carolina Assoc. of Ins. Agents, Inc. v. United States,* 739 F.2d 949, 954 (4th Cir. 1984); *see National Muffler Dealers Assn., Inc. v. United States,* 440 U.S. 472, 477–84, 99 S.Ct. 1304, 1307–11, 59 L.Ed.2d 519 (1979).

### A.

The government argues that CUIC does not qualify as a business league because its activities are not directed to the improvement of business conditions of credit unions. Instead, the government argues, its primary purpose is to provide a particular service—insurance coverage of deposits—to individual credit unions.

The government relies primarily on *MIB, Inc. v. Commissioner,* 734 F.2d 71 (1st Cir. 1984), in which the First Circuit determined that MIB, Inc. ("MIB") was not a business league under § 501(c)(6). MIB was a nonprofit corporation that operated a data bank

containing information concerning the health and insurability of life insurance applicants. MIB disseminated information from its data bank to member life insurance companies, who used the information to check for possible omissions or misstatements in current life insurance applications. Member companies paid an annual "basic assessment," based on the amount of insurance the member company had in force in a given year. Members also paid "checking charges," based on the number and type of information requests made by them.

The First Circuit concluded that MIB was not a business league because it provided particular services to its individual members. *Id.* at 77. MIB responded to a member's particular request about an individual insurance applicant by providing whatever information it had about that applicant in the data bank. The member then used that information as an aid in deciding whether to sell insurance to the applicant. MIB argued that it provided a general benefit to the life insurance industry as a whole because it served as a powerful deterrent to fraud and misrepresentation. Nonetheless, the First Circuit held that, "[w]hile it may be that the availability of such individual services also confers a general benefit upon all members and acts in the collective interest as a deterrent, it remains inescapable that the services being performed are 'particular services for individual persons.'" *Id.* at 78. In so holding, the First Circuit found significant the fact that MIB received fees in proportion to each member's use of the information data bank. *Id.* at 79.

The government argues that CUIC, like MIB, provides a particular service to individual members. CUIC provides deposit insurance coverage to member credit unions. Although the existence of deposit insurance provides a general benefit to all credit unions by promoting financial stability in the credit union industry, the government contends that we cannot escape the fact that CUIC provides deposit insurance only to member credit unions. Furthermore, the government argues that each member credit union pays for CUIC's services in proportion to the coverage received. Each credit union maintains a deposit with CUIC equal to one percent of its outstanding shares; thus, the government argues, each credit union pays a "premium" in proportion to the amount of coverage required.

The government fails to appreciate the type of benefit that deposit insurance confers. Deposit insurance does not provide any direct benefit to credit unions; it protects the people who invest their money in a credit union in case the credit union becomes financially insolvent and cannot return the funds to the depositors. A credit union does not need deposit insurance for its own sake because the insurer confers benefits only after the credit union has ceased to be a solvent institution. Credit unions maintain deposit insurance because it is required by law. The state of Maryland requires each credit union incorporated in Maryland to participate in, and have its member accounts insured by, either CUIC or the National Credit Union Administration Share Insurance Program. Md.Fin.Inst.Code Ann. § 6–601(a). Deposit insurance confers only an indirect benefit to credit unions: the existence of a reserve fund to guarantee deposits in credit unions increases investor confidence in the credit unions and improves the strength of the credit union industry as a whole.

Deposit insurance is categorically different from the service that MIB provided to its members. Life insurance companies participated in MIB to receive information that would help them make better business decisions. The information improved their ability to root out fraudulent applications, which made them stronger businesses. CUIC, on the other hand, does not confer any direct benefit to its member credit unions that will improve their business. CUIC's insurance fund exists simply to protect the depositors in case a credit union fails.

Deposit insurance, furthermore, is categorically different from other types of insurance that a business may purchase. Businesses purchase all kinds of liability policies to protect themselves in the face of accidents, negligence, and acts of God. Purchasing insurance guarantees a business that an unfortunate occurrence will not ruin it. Liability insurance serves as a tool to help

businesses remain solvent. Deposit insurance, on the other hand, confers benefits only after a credit union has become insolvent. A credit union participates in CUIC not to ensure that it remain a solvent business should some unfortunate circumstance occur, but to guarantee that the depositors' funds will be repaid should the credit union fail to remain solvent.

In maintaining a reserve fund to insure the deposits in member credit unions, CUIC does not simply provide a particular service to its individual members, but instead confers a general benefit to the credit union industry as a whole. Furthermore, CUIC engages in other activities, in addition to its maintenance of a deposit insurance fund, which are directed to the improvement of business conditions in the credit union industry. *See* Md.Fin. Inst.Code Ann. § 7–103 (enumerating CUIC's ten purposes, of which insuring the deposits of member credit unions is only one). CUIC works closely with the Maryland Bank Commissioner to monitor the financial condition of member credit unions. It reviews the semi-annual financial reports of financial conditions filed by its member credit unions. If CUIC discovers that a member credit union is in an unsafe or unsound financial condition, or is suffering liquidity problems, CUIC may inform the Bank Commissioner. Working in conjunction with the Bank Commissioner, CUIC may take any of the following courses of action: (1) direct the credit union to undertake or cease a particular course of action, (2) make a liquidity loan to the credit union, or (3) identify a suitable merger partner for the failing credit union and facilitate the merger by making an acquisition loan to the acquirer or by guaranteeing certain assets of the failing credit union.

Thus, CUIC performs some quasi-regulatory functions. During the taxable years 1984 through 1992, CUIC made $210,000 in liquidity loans to member credit unions and has never suffered a loss on such a loan. CUIC has never made an acquisition loan, but it guaranteed $324,279 of assets in connection with mergers of failing credit unions between 1984 and 1992. It suffered $20,571 in losses on asset guarantees during this time period. CUIC has succeeded in its oversight of member credit unions, especially considering that no holder of a share or deposit account insured by CUIC has ever suffered a loss that CUIC would have had to cover.

Furthermore, CUIC's members do not pay for CUIC's services in proportion to the benefits received. Each member credit union maintains a deposit with CUIC equal to one percent of the shares and deposits accounts outstanding in a given year. This method of collecting funds from its members resembles the "basic assessment" in *MIB*. Member life insurance companies paid to MIB an annual "basic assessment" based on the amount of insurance each member had in force in a given year. The *MIB* court, however, did not conclude that the basic assessment demonstrated that MIB provided a particular service for its individual members. Instead, the *MIB* court had a problem with the "checking charges" that MIB assessed to the members for each information request from the data bank; the checking charges demonstrated that MIB provided a particular service to individual members. CUIC does not employ any method of raising funds from its members that resembles the checking charges in *MIB*.

We conclude that CUIC does not provide a particular service to its individual member credit unions, but instead performs activities directed at the improvement of business conditions in the credit union industry as a whole.

**B.**

The government also argues that CUIC does not qualify as a business league because it is engaged in a business normally operated for profit.

 A corporation is engaged in a business normally operated for profit if it competes with for-profit entities engaged in the same business. Even if it does not have competition in the marketplace, however, a corporation is nonetheless engaged in a business normally operated for profit if for-profit businesses could and would perform similar functions if the corporation ceased its operations. *North Carolina Assoc. of Ins. Agents,*

*Inc. v. United States,* 739 F.2d 949, 955 (4th Cir.1984) (citing, with approval, *Mib, Inc. v. Commissioner,* 80 T.C. 438, 1983 WL 14800 (1983)).

The government argues that many for-profit corporations are engaged in the same business as CUIC. It contends that CUIC is engaged in the business of providing insurance, an activity normally engaged in by for-profit businesses. Although no for-profit business currently insures the deposit of financial institutions in Maryland, many for-profit businesses provide other forms of insurance that corporations regularly purchase.

We reject the government's attempt to compare CUIC's activities with those provided by regular for-profit insurance carriers. As we have already demonstrated, deposit insurance is qualitatively different from other forms of insurance. Credit unions purchase deposit insurance not to benefit themselves, but to protect the assets of depositors in case the credit union becomes financially insolvent. Credit unions participate in CUIC or the National Credit Union Administration Share Insurance Program because it is required by Maryland law.

A for-profit business would not and could not perform the functions provided by CUIC. CUIC can do business only because Maryland law requires all credit unions that are not members of the National Credit Union Administration Share Insurance Program to participate in CUIC. Maryland has not allowed for-profit insurance companies to insure the deposits of credit unions.

Nor should it. It makes sense to allow for-profit corporations to provide insurance for accidents and other occurrences because the competition among insurance companies guarantees that the premiums charged to the insured, and the profits earned by the insurance companies, bear some relation to the risks incurred. With deposit insurance, however, competition among for-profit insurance companies would not determine a fair amount that the insurers could claim as profit. Deposit insurance requires the continual maintenance of a reserve fund in case a credit union becomes insolvent. Ideally, no credit union becomes insolvent, the insurer never has to pay any claims, and the funds in

the reserve continue to grow. Competition among for-profit insurers would not determine what portion of that fund would constitute the profit. Conceptually, it makes sense for a non-profit corporation to administer such a reserve fund, and every state that has created an institution to insure the deposits of financial institutions has made it non-profit.

Furthermore, CUIC performs quasi-regulatory functions that for-profit insurers do not. CUIC monitors the financial health of its member credit unions and reports any problems to the Maryland Bank Commissioner. If necessary, CUIC will make liquidity loans to a member credit union or facilitate the merger of a failing credit union to a solvent credit union. While for-profit insurance companies simply insure against the risk of loss, CUIC takes affirmative steps, when necessary, to improve the financial strength of its member credit unions.

We therefore disagree with the government's contention that CUIC engages in a business normally carried on for profit.

### III.

For the foregoing reasons, we conclude that CUIC meets all the criteria of a business league and is entitled to an exemption from tax under 26 U.S.C. § 501(c)(6). Furthermore, we conclude that the exemption for insurers of cooperative banks under 26 U.S.C. § 501(c)(14)(B) does not apply to CUIC and does not prevent the application of the business league exemption under § 501(c)(6). Therefore, we affirm the judgment of the district court.

*AFFIRMED.*