The WEST VIRGINIA MINING AND RECLAMATION ASSOCIATION, et al., Plaintiffs,

v.

Bruce BABBITT, Secretary of the Interior, et al., Defendants.

Civ. A. No. 2:96–0371.

United States District Court, S.D. West Virginia, Charleston Division.

July 11, 1997.

Charles Q. Gage, Jackson & Kelly, Charleston, WV, Dean K. Hunt, Buchanan Ingersoll, Lexington, Ky, for Plaintiffs.

Rebecca A. Betts, U.S., Attorney, Charleston, WV, Richard M. Hall and Martin J. LaLonde, U.S. Department of Justice, Washington, DC, Steven C. Barcley, Special Assistant U.S. Attorney, Pittsburgh, PA, for Defendants.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are (1) the parties' cross motions for summary judgment; (2) Defendants' motion to dismiss Count VII of the Complaint; and (3) Defendants' motion for leave to exceed the page limitation contained in *Local Rule 4.01, Local Rules of Civil Procedure.* The Court (1) **GRANTS** Defendants' motion for summary judgment; (2) **DENIES** Plaintiffs' motion for summary judgment; (3) **DENIES** as moot Defendants' motion to dismiss Count VII; and (4) **GRANTS** Defendants' motion for leave to exceed the page limita-

tion.[1]

The resolution of the instant motions boils down to two considerations: (1) the straightforward application of the principles laid down *in Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); and (2) the enforcement of the weighty policy of cost internalization present in the federal Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201 *et seq.*:

> The imposition of all reclamation costs on operators is consistent with and supported by the legislative history of the SMCRA. Congress characterized Senate Bill 425, the "Surface Mining Act of 1973," as follows:
>
>> "The purpose of this bill is to effect the internalization of mining and reclamation costs, which are now being borne by society in the form of ravaged land, polluted water, and other adverse effects, of coal service [sic] mining.
>>
>> The cost of the environmental controls and reclamation requirements provided for under the Act are properly borne by the mine operators . . ."

*Cat Run Coal Co. v. Babbitt*, 932 F.Supp. 772, 780 (S.D.W.Va.1996)(quoting 119 Cong. Rec. 33181 (Oct. 8, 1973)).

## I. INTRODUCTION

The Plaintiffs are trade associations whose members include coal producers and businesses engaged in coal mining and related activities throughout West Virginia. They are subject to the federally approved regulatory program contained in the West Virginia Surface Coal Mining Reclamation Act (WVSMCRA), *West Virginia Code* sections 22–3–1 to 22–3–32 and its accompanying reg-

ulations, *West Virginia Code of State Regulations* (WVCSR) §§ 38–2–1 et seq. (the West Virginia Program).

The Office of Surface Mining Reclamation and Enforcement (OSM), a division of the Department of the Interior, is responsible for administering SMCRA,[2] including the review and approval or disapproval of amendments to state regulatory programs adopted pursuant to SMCRA. *See* 30 C.F.R. § 732.1 to .17; *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 663 (4th Cir.1997). Defendant Bruce Babbitt is the Secretary of the Interior (Secretary) who is charged under SMCRA with reviewing and passing on changes to state regulatory programs adopted pursuant to SMCRA, including the West Virginia Program. Defendant Robert Uram was the Director of the OSM and was responsible for the review and approval or disapproval of amendments to state regulatory programs adopted pursuant to SMCRA. The regulatory authority responsible for implementing the West Virginia Program is the West Virginia Division of Environmental Protection (WVDEP).

On February 21, 1996 OSM published a final rule approving many proposed amendments to the West Virginia Program. One of the disapproved amendments, which would have modified WVCSR § 38–2–2.20, is the subject of the parties' dispute.

## II. BACKGROUND

### A. *Statutory and Regulatory Framework*

#### 1. **State Primacy Under SMCRA**

Pursuant to 30 U.S.C. § 1253, a state may assume primary jurisdiction for regulating surface mining within its borders by submitting a program proposal to the Secretary.

---

1. All remaining Counts of the Complaint have been resolved amicably, with the exception of Count V. The Court thus disregarded the briefing related to the settled Counts.

2. Congress enacted SMCRA in 1977, in part, to "assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided and strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy[.]" 30 U.S.C. § 1202(f); *see U.S. v. E & C Coal Co.,*

*Inc.*, 846 F.2d 247, 248 (4th Cir.1988)("The Surface Mining Control and Reclamation Act (SMCRA) was designed to protect the environment from the adverse effects of surface coal mining operations."); *U.S. v. S.S. (Joe) Burford, Inc.*, 761 F.2d 173, 173 (4th Cir.1985); *Commonwealth of Va. ex rel. Virginia Dept. of Conservation & Econ. Devel. v. Watt*, 741 F.2d 37, 38 (4th Cir.1984). In sum, the Act provides for comprehensive regulation of surface coal mining and reclamation of mined lands.

West Virginia applied for primacy. The Secretary granted the State's request effective January 21, 1981. *See* 30 C.F.R. § 948.10.

States with approved programs may submit proposed program amendments for approval by the Director of OSM. 30 C.F.R. § 732.17. Program amendments may consist of, *inter alia,* changes to state statutes or regulations. *See* 30 C.F.R. § 732.17(b)(3). The amendments are then approved or disapproved by the Director, following a period of notice and an opportunity for public comment. 30 C.F.R. § 732.17(h).

■ The Director may approve a program amendment upon finding that the amendment is in accordance with SMCRA and consistent with SMCRA's implementing regulations. 30 C.F.R. §§ 732.15(a), 732.17(h)(10); *see Cat Run Coal Co. v. Babbitt*, 932 F.Supp. 772, 778 (S.D.W.Va.1996) (stating "In approving newly proposed state regulations, OSM must determine whether the proposed regulations are 'consistent with' the SMCRA, *see* 30 U.S.C. § 1253(a)(7), and 'no less effective than' OSM's own regulations, *see* 30 C.F.R. § 730.5."). Further, the proposed amendments may not supersede, amend, modify or repeal the enforcement mechanisms contained in other federal environmental laws, including the Clean Water Act, 33 U.S.C. §§ 1251–1387(CWA). *See* 30 U.S.C. § 1292(a)(3).[3]

Title 30 U.S.C. § 1255 of SMCRA, among other provisions, controls the Director's discretion of whether to approve state program amendments:

(a) No State law or regulation in effect on [the date of enactment of this Act], or which may become effective thereafter, shall be superseded by any provision of this chapter or any regulation issued pursuant thereto, *except insofar as such State law or regulation is inconsistent with the provisions of this chapter.*

(b) Any provision of any State law or regulation in effect upon [the date of enactment

of this Act], or which may become effective thereafter, *which provides for more stringent land use and environmental controls and regulations of surface coal mining and reclamation operation than do the provisions of this chapter or any regulation issued pursuant thereto shall not be construed to be inconsistent with this chapter.* The Secretary shall set forth any State law or regulation which is construed to be inconsistent with this chapter. Any provision of any State law or regulation in effect on [the date of enactment of this Act], or which may become effective thereafter, which provides for the control and regulation of surface mining and reclamation operations for which no provision is contained in this chapter shall not be construed to be inconsistent with this chapter.

30 U.S.C. § 1255 (emphasis added).

## 2. The SMCRA Bonding Requirement

■ SMCRA's bonding program is designed to assure "complete reclamation of mine sites." *See Cat Run Coal Co.*, 932 F.Supp. at 774–75, 778. Every operator must post a reclamation bond before mining begins. 30 U.S.C. § 1259(a). The bond is calculated to ensure the commitments set forth in the permit and SMCRA are carried out. The financial responsibility imposed by the bond guarantees funds are available to reclaim mined lands if an operator defaults and to give the operator an incentive to comply with reclamation requirements. *See, e.g.,* 30 C.F.R. § 800.11(e)(1) & (2) (requiring alternative bonding systems to meet the objectives and purposes of the bonding program, by providing "a substantial economic incentive for the permittee to comply with all reclamation provisions."); *Cat Run Coal Co.*, 932 F.Supp. at 778.

West Virginia employs an alternative, two-tiered bonding system. *Cat Run Coal Co.*, 932 F.Supp. at 775 n. 7. Permittees must post site-specific bonds, at rates ranging

---

**3.** Section 1292(a)(3) provides in pertinent part:
(a) Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing ... any of the following Acts or with any rule or regulation promulgated thereunder, including, but not limited to—

. . .

(3) The Federal Water Pollution Control Act (79 Stat. 903), as amended ... the State laws enacted pursuant thereto, or other Federal laws related to preservation of water quality.
30 U.S.C. § 1292(a)(3).

from $1,000.00 to $5,000.00 per acre for each permit, to conduct surface coal mining operations. W. Va.Code § 22–3–12(c)(1). In addition, persons who conduct surface coal mining operations contribute a fee of three cents per ton of coal mined to West Virginia's Special Reclamation Fund (Fund). W. Va. Code § 22–3–11(g). The West Virginia Division of Environmental Protection (WVDEP) expends monies from the Fund to reclaim sites for which the posted and then forfeited site-specific bond is insufficient to cover the costs of reclamation. *Id.*

To be released from bond liability under SMCRA, an operator must apply to the appropriate state or federal regulatory authority and demonstrate performance of the reclamation work required under SMCRA and the bond. 30 U.S.C. § 1269(a). After receiving a completed application for release, the regulatory authority inspects the reclamation work to determine if it has been satisfactorily accomplished. 30 U.S.C. § 1269(b). In evaluating compliance, the authority considers, "among other things, the degree of difficulty to complete any remaining reclamation, whether pollution of surface and subsurface water is occurring, the probability of continuance of future occurrence of such pollution, and the estimated cost of abating such pollution." *Id.*

There are three phases to reclamation. First, the operator must complete backfilling, grading, and drainage control in accordance with the reclamation plan. 30 U.S.C. § 1269(c)(1). In the second phase, the operator must revegetate the regraded mined lands. 30 U.S.C. § 1269(c)(2). Both SMCRA and the OSM regulations prohibit releasing any part of the bond under this phase if the site is contributing suspended solids to runoff or streamflow outside of the permit area exceeding discharge standards. 30 U.S.C. § 1269(c)(2); 30 C.F.R. § 800.40(c)(2). Finally, the "catch-all" phase of reclamation provides that "no bond shall be fully released until all reclamation requirements of this chapter are fully met." 30 U.S.C. § 1269(c)(3).

Once bond is released, WVDEP's and OSM's jurisdiction pursuant to WVSMCRA and SMCRA over the mining site may be terminated. WVCSR § 38–2–1.5(c)(2); 30 C.F.R. § 700.11(d)(1); 53 Fed.Reg. 44,356 (1988). Once jurisdiction is terminated, the monies in the Fund are apparently no longer available to cover further costs of reclamation, such as continuing treatment of acid mine drainage ("AMD"). The Fund apparently may be used only to reclaim sites for which the bond has been forfeited, rather than released. W. Va.Code 22–3–11(g).

### 3. The Formation and Reclamation of AMD

The characteristics of AMD, which basically constitute water polluted with high acidity and perhaps other compounds, and the damage it causes, are set forth in Defendants' response memorandum:

Acid mine drainage forms when iron-sulphur compounds are exposed through mining to the air causing them to oxidize in the presence of water and oxygen. After the initial oxidation of the iron sulfide, the acid-producing reaction can become self-sustaining.

Acid mine drainage is unlike other results of surface mining that must be addressed through reclamation. On one hand, once a mine has been backfilled, graded, and revegetated, that part of the task is complete once the revegetation is established. On the other hand, treatment of acid mine drainage can be a long-term undertaking. Whereas there is a degree of certainty with respect to the success of land reclamation, such certainty is not present with respect to acid mine drainage. Because the cessation of mining may not stop acid mine drainage, the operator may have to indefinitely treat the problem once it has formed.

The mine operator may use either active or passive water quality treatment systems to combat acid mine drainage. An active water quality treatment system is a manual or mechanical system relying on chemical processes and requiring periodic addition of reagents, ongoing support, and maintenance. One example of an active treatment is adding lime to a treatment pool to raise the ph of an acidic discharge. Passive water quality treatment is de-

signed to be a self-sustaining system that relies on chemical or biological processes that should require no external reagents, maintenance, or support. Such passive systems include constructed wetlands. The effectiveness of passive treatment systems, particularly over the long term, has not been established. Ongoing maintenance and support of such systems is likely to be required. *See* OSM's directive TSR–10, Use of Wetland Treatment Systems for Coal Mine Drainage. . . .

Defs.' Memo. in Opp. at 8–9.[4]

### 4. The Policy of Cost Internalization

■ This Court recently recognized a bedrock principle of SMCRA is the obligation of the mine operator to bear the costs associated with surface mining, from the permitting of a mining operation through to the conclusion of the reclamation process. *See Cat Run Coal,* 932 F.Supp. at 780–81 (referring to legislative history and prior legislation); *see supra* at ——.

### B. The Challenged Rulemaking

In letters dated June 28, 1993, and July 30, 1993 the WVDEP submitted amendments to the West Virginia Program. Submission of revised amendments and public comment oc-

---

4. Plaintiffs object to any consideration of TSR–10. The Court will utilize the document for this limited purpose. This use is necessitated to *some extent by Plaintiffs' failure to offer* sufficient evidence showing passive treatment systems ensure AMD discharges will not occur in a post-bond release setting.

5. "[C]hemical treatment" is employed by the West Virginia Program's bond release provision found at WVCSR section 38–2–12.2(e). That section prohibits bond release where "chemical treatment" is necessary to bring water discharged from, or affected by, a mining operation into compliance with certain regulations and laws. That section provides as follows:

Notwithstanding any other provisions of this section or these regulations, no bond release or reduction will be granted if, at the time, water discharged from or affected by the operation requires chemical treatment in order to comply with applicable effluent limitations or water quality standards as set forth in paragraph (b), subsection 14.5 of these regulations.
*Id.*

6. The full rationale for disapproval follows:

---

curred. OSM held public meetings in West Virginia on various dates. OSM issued a final rule on the proposed amendments on February 21, 1996. The rule approved the majority of the proposed amendments but disapproved a number of them for various stated reasons. Plaintiffs challenge the disapproval of proposed WVCSR § 38–2–2.20, which provides as follows:

2.20 Chemical Treatment means the treatment of water from a surface coal mining operation using chemical reagents such as but not limited to sodium hydroxide, calcium carbonate, or anhydrous ammonia for purposes of meeting applicable state and federal effluent limitations. *Chemical treatment does not include passive treatment systems such as but not limited to limestone drains, wetlands, alkaline addition, application of flyash, agricultural lime, or injection of flyash, limestone, or other minerals into underground coal operations.*

*Id.* (emphasis added).[5] The Director disapproved this section and ordered the State to revise the regulation. The Director mandated clarification to the effect that bond may not be released where passive treatment systems are used to achieve compliance with applicable effluent limitations.[6]

The WVDEP proposes to define "chemical treatment" at subsection 2.20. This definition, among other applications, applies to the bond release provisions at CSR 38–2–12.2(e). CSR 38–2–12.2(e) prohibits bond release where chemical treatment is necessary to bring water discharged from or affected by the operation into compliance with effluent limitations or water quality standards as set forth in CSR 38–2–14.5(b). In effect, for example, under the proposed definition, bond would not be released under § 38–2–12.2(e) if water discharged from or affected by an operation is being actively treated by chemical reagents (such as sodium hydroxide or calcium carbonate) to bring a discharge into compliance. *The bond would be released, however, if that same water were being treated, instead, by passive treatment systems (such as wetlands or limestone drains) to bring the discharge into compliance.* The Director finds that the blanket exclusion of passive treatment systems from the definition of chemical treatment would render the West Virginia program less effective than the Federal regulations at 30 CFR 800.40(c)(3) concerning release of bond. 30 CFR 800.40(c)(3) provides that no bond shall

Plaintiffs assert, *inter alia,* the disapproval was erroneous because (1) it was contrary to the express provisions of SMCRA; (2) it was inconsistent with OSM's own regulations for bond release; and (3) it was inconsistent with the provisions of the CWA.

The Court enjoys jurisdiction pursuant to 5 U.S.C. § 702 and 30 U.S.C. § 1276(a)(1). Venue is proper under the latter statute. *See Cat Run Coal Co.,* 932 F.Supp. at 777 n. 10.

### III. STANDARD OF REVIEW

Through SMCRA Congress provided only a small window of relief from determinations made by the Director:

> Any action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law.

*Id.*

An agency's interpretation of a statute it is charged with administering is subject to the oft-enunciated rules of construction of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed *the precise question* at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (emphasis added). Our Court of Appeals has adhered faithfully to the *Chevron* mandate. *See, e.g., Doolin Sec. Sav. Bank, F.S.B. v. FDIC,* 53 F.3d 1395, 1400 (4th Cir.), *cert. denied,* ——— U.S. ———, 116 S.Ct. 473, 133 L.Ed.2d 402 (1995); *Kofa v. U.S. I.N.S.,* 60 F.3d 1084, 1087–88 (4th Cir.1995); *Norfolk & Western Ry. Co. v. Roberson,* 918 F.2d 1144, 1147 (4th Cir.1990), *cert. denied,* 500 U.S. 916, 111 S.Ct. 2012, 114 L.Ed.2d 99 (1991); *Newport News Shipbuilding & Dry Dock Co. v. Howard,* 904 F.2d 206, 210 (4th Cir.1990)(stating "In any event, *Chevron* warns against our undertaking a balance of competing policy goals by way of coming up with our own interpretation. Our function is simply to determine whether the balance struck by the Director embodies a reasonable interpreta-

be fully released until reclamation requirements of SMCRA are fully met. If treatment is necessary to maintain compliance, whether it be active or passive treatment, then the hydrologic protection standards of SMCRA section 515(b)(10) have not been fully met and bond cannot be released. The withheld bond helps assure that the required treatment will be continued. The fact that a treatment system is "passive," and may not require human intervention as frequently as an "active" treatment system, does not diminish the need for assurance that treatment will be provided as long as is necessary to maintain compliance. Therefore, the Director is approving the definition of "chemical treatment" except to the extent that it would allow bond release where passive treatment systems are used to achieve compliance with applicable effluent limitations as discussed above.... This finding does not mean that OSM is discouraging the use of mining and reclamation practices and the use of passive treatment systems that help minimize water pollution. On the contrary, when such practices and passive systems are designed into the approved operations and reclamation plans, they become an integral part of an effective program to minimize the formation of acidic or toxic drainage. However, when such passive systems are used to treat a discharge that would otherwise not be in compliance with effluent discharge limitations, such systems are, in effect, chemical treatment and bond release should not be granted. Passive treatment systems have not yet been proven effective for all parameters or on a long-term basis; their effectiveness appears to decrease over time. See OSM's directive TSR–10, Use of Wetland Treatment Systems for Coal Mine Drainage, for further information on this issue.
61 Fed.Reg. 6511, 6517 (1996)(emphasis added).

tion of statutory provisions whose intended meaning is by no means plain.").[7] This Court likewise has observed and applied the rule. *Cook v. Espy*, 856 F.Supp. 1095, 1099 (S.D.W.Va.1994).

■ Our Court of Appeals has observed "[d]eference is especially 'appropriate' when a statute ... 'has produced a complex and highly technical regulatory program' requiring numerous 'policy determinations' within the expertise of the agency." *Maryland Dept. of Human Resources v. U.S. Dept. of Agriculture*, 976 F.2d 1462, 1470 (4th Cir. 1992); *Mowbray v. Kozlowski*, 914 F.2d 593, 598–99 (4th Cir.1990)(stating further "In a statutory area as complicated as this one, the administrative authorities are far more able than this Court to determine congressional intent in the light of experience in the field. If the result is unacceptable to Congress, it has only to clarify the situation with language that unambiguously specifies its intent.").

■ In *Warren v. North Carolina Dept. of Human Resources*, 65 F.3d 385 (1995), the court further explained the Chevron inquiry:

> To sustain the agency's interpretation, we need not find that it is the only permissible construction which the agency might have adopted or that it is the interpretation which we would have reached on our own, but only that the agency's understanding is *sufficiently rational* to preclude a court from substituting its own judgment for that of the agency. Indeed, if an agency charged with a statute's enforcement interprets the statute's textual ambiguities in such a way as to accommodate conflicting policies reasonably, a court must not disturb the agency's interpretation unless it runs counter to the statutory language or the legislative history.

*Id.* at 391 (emphasis added) (citations omitted).

■ Like an agency's interpretation of a statute, an agency's interpretation of its own regulations is similarly entitled to deference. The Court in *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) stated as follows:

> we must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " In other words, we must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." This broad deference is all the more warranted when, as here, the regulation concerns "a highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns."

*Id.* at 512, 114 S.Ct. at 2387 (citations and quoted authority omitted); *see also United States v. Boynton*, 63 F.3d 337, 342 (4th Cir.1995); *Pressley Ridge Schools, Inc. v. Stottlemyer*, 947 F.Supp. 929, 938 (S.D.W.Va. 1996).

It is with these standards and caveats the Court examines Plaintiffs' challenge.[8]

## IV. DISCUSSION

### A. *Application of the Chevron Test:*

**1. Has Congress directly addressed the precise question at issue?**

The Director maintains bond may not be released until AMD2126 is wholly avoided without the need for further treatment. The conflict between the Director's position and the proposed amendment is apparent. Plaintiffs first assert the Director's position and

---

7. Lesser deference is accorded an agency's interpretation that differs with its prior interpretations of the same statute. *See, e.g., Credit Union Ins. Corp. v. U.S.*, 86 F.3d 1326, 1332 (4th Cir. 1996); *Hanauer v. Reich*, 82 F.3d 1304, 1311 n. 4 (4th Cir.1996)(citing cases).

8. Plaintiffs do not apparently challenge the applicability of the *Chevron* test. *See* Pls.' resp. memo at 2–3.

the consequent disapproval of WVCSR section 38-2-2.20 are contrary to the express provisions of SMCRA. This argument, which requires a search of SMCRA for an explicit command against the Director's approach, dovetails nicely with the first inquiry under Chevron: Has Congress directly spoken to the precise question at issue in this case?

■ Although Plaintiffs have attempted a broader approach, the *precise* question at issue is whether an operator's performance bond may be released if treatment of AMD remains necessary. Plaintiffs assert, contrary to the Director's findings, that 30 U.S.C. § 1265(b)(10) recognizes the propriety of treatment. Plaintiffs rely on the following underscored language from the statute:

> General performance standards shall be applicable to all surface coal mining and reclamation operations and shall require the operation as a minimum to—
>
> . . . .
>
> (10) *minimize the disturbances to the prevailing hydrologic balance* at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems *both during and after surface coal mining operations and during reclamation* by—
>
> (A) *avoiding acid or other toxic mine drainage by such measures as, but not limited* to—(i) preventing or removing water from contact with toxic producing deposits; (ii) *treating drainage to reduce toxic content which adversely affects downstream water upon being released to water courses;* (iii) casing, sealing, or otherwise managing boreholes, shafts, and wells and keep acid or other toxic drainage from entering ground and surface waters[.]

9. Defendants also note the lack of a definition for "avoid." While neither party raises the issue, the Court notes the common and ordinary meaning of "avoid" is "to *prevent* the occurrence of" something. Webster's Third New International Dictionary 151 (3rd ed.1981)(emphasis added).

10. Plaintiffs place much emphasis on section 1265(b)(10)'s use of the phrase "both during and after surface coal mining operations and during reclamation...." The language provides them

*Id.* Defendants concede section 1265(b)(10) contemplates treatment as a means of avoiding AMD *during mining and reclamation.* They assert a difference, however, between this and the question under consideration involving *bond release* when AMD treatment may remain necessary.[9] The Court concurs with the Defendant Director.

■ The Director's position is quite tenable when one considers applicable regulations and other SMCRA provisions. Title 30 U.S.C. § 1269(c)(3) states "no bond shall be fully released until all reclamation requirements of this chapter are fully met." *Id.* Similarly, 30 C.F.R. § 800.40(c)(3) provides as follows:

> (c) The regulatory authority may release all or part of the bond for the entire permit area or incremental area if the regulatory authority is satisfied that all the reclamation or a phase of the reclamation covered by the bond or portion thereof has been accomplished in accordance with the following schedules for reclamation of Phases I, II, and III:
>
> . . . .
>
> (3) At the completion of Phase III, *after the operator has completed successfully all surface coal mining and reclamation activities,* the release of the remaining portion of the bond, but not before the expiration of the period specified for operator responsibility in § 816.116 or § 817.116 of this chapter. However, *no bond shall be fully released under provisions of this section until reclamation requirements of the Act and the permit are fully met.*

*Id.* (emphasis added).[10] Further, it is important to note that section 1265(b)(10) is only a "general performance" provision requiring an absolute "minimum" standard to be adhered to by operators. 30 U.S.C. § 1265(b). Noth-

little solace. One reasonably could conclude the sequential placement of the terms "during and after ... mining" and "during reclamation" simply are meant to cover the time period commencing with operations and continuing into the reclamation phase at some point prior to its conclusion. Had Congress wanted to cover the postbond release period, as urged by Plaintiffs, it easily could have done so.

ing in section 1265 appears to prevent the imposition of slightly higher standards appropriate and consistent with the congressional mandate. At a minimum, then, SMCRA is ambiguous as to whether bond may be released if AMD treatment remains necessary.

Plaintiffs fall back on the following portions of SMCRA's legislative history to demonstrate the Director's position is at odds with the statutory scheme:

1. The total prevention of adverse hydrologic effects from mining is impossible and thus the bill sets attainable standards to protect the hydrologic balance of impacted areas within the limits of feasibility.

   . . . .

   With respect to acid mine and other toxic drainage, a wide range of alternatives is available to the industry to avoid pollution of ground and surface waters through a number of techniques, including treatment, diversion of water from producing deposits, and isolation of toxic overburden from ground and surface water flow.

   . . . .

   In cases where there will be water discharge from the mine sites, the number of such discharges should be minimized by collectively controlling and channeling the watercourse into an acceptable receiving stream or area location. It also should be understood that prior to any discharge off the permit area, the discharge should be treated to remove pollutants that may be present.

   H.R.Rep. No. 95–218, at 100, 109 and 112–13 (1977).

2. The managers commend the OSM on its efforts to address acid mine drainage problems. In pursuing this initiative the OSM should comply carefully with the Surface Mining Control and Reclamation Act and with Federal rulemaking requirements. A wide

range of alternatives should continue to be considered to reduce pollutants during mining and to prevent post mining discharge of polluted water, including mitigation and treatment to reduce pollutants that may be present before final discharge off the mine permit area.

H.R. Conf. Rep. No. 740, at 49 (1994); *see also* S.Rep. No. 294, at 51 (1994).

Defendants counter with the following congressional observations:

1. The bill requires that the operator will take such measures as are necessary to minimize the disturbance to the hydrologic balance in the surrounding areas. *In addition, the operator is to conduct reclamation activities on a continuing basis that assure the impacts are minimized after mining has been completed.*

   H.R.Rep. No. 95–218, at 101 (1977)(emphasis added).

2. The adequacy of siltation control is to be gauged against natural levels of suspended solids as measured prior to mining, for *it is the intent of the conferees that, after mining and reclamation there be no offsite degradation of water quality.*

   Sen. Rep. No. 94–101, at 84 (1975)(emphasis added).[11]

As can be seen from a comparison of the competing provisions, little in the way of clarification is obtainable on the precise question involved. One certainly cannot divine the unambiguous adoption of Plaintiffs' position by the House or Senate. The only certainty one can gather from SMCRA's adoption is that it was a compromise bill, with many competing considerations left for the Director and the courts. Based on its review of SMCRA and its legislative history, the Court concludes Congress was at the very least ambiguous as to whether bond may be finally released if treatment of AMD remains necessary.[12] This likewise disposes

---

11. Consideration of this snippet of prior legislative history is wholly appropriate. *See Cat Run Coal Co.,* 932 F.Supp. 772, 780 n. 15.

12. Even were treatment acceptable for bond release, the lingering difficulty with the proposed amendment is its hands-off approach to passive treatment. An operator conceivably could erect

of Plaintiffs' argument that the Director's disapproval of the proposed amendment to the West Virginia Program is contrary to the express provisions of SMCRA.[13] Having found SMCRA at least ambiguous on the precise question, the Court proceeds to the second prong of the *Chevron* inquiry.

### 2. Is the Director's position based on a permissible construction of the statute?

SMCRA and its accompanying regulations comprise an intricate and complicated scheme, which contains a wealth of Congressional policies and purposes. *See, e.g.,* 30 U.S.C. §§ 1201, 1202. Further, the overriding policies of SMCRA, minimization of environmental damage and maximization of coal production, necessarily are in tension with each other. It is within this delicate framework that OSM regulates.

■ The Director has determined that during operations and reclamation a miner can use many methods to avoid AMD, including treatment. This permission, however, does not mean treatment is sufficient to avoid AMD for bond release purposes. For purposes of bond release, the Director interprets avoidance as long-term avoidance not requiring continuing maintenance or intervention. As observed similarly by one court of appeals, "release of ... bond indicates that the regulatory authority is satisfied that reclamation is complete and the site is no longer likely to produce contaminated runoff." *American Mining Congress v. U.S. EPA,* 965 F.2d 759, 768 (9th Cir.1992); *see Cat Run Coal Co.,* 932 F.Supp. at 781 n. 17 (observing "OSM has ... directed West Virginia to amend its bonding program to en-

sure sufficient money be available to *complete reclamation, including the perpetual treatment of polluted water* to meet the Clean Water Act standards, at all existing and future bond forfeiture sites[.]")(emphasis added).

■ The Director's position comports with fundamental SMCRA purposes. First, it acts to internalize the costs of mining with the operator, a consideration not lost on this Court:

> [I]n ensuring West Virginia's alternative bonding program achieves the objectives of ... SMCRA, OSM consistently has demanded all reclamation costs, including water treatment, be covered ... solely by the bond system funded by coal operators and permittees.... In so doing, OSM has required an industry-supported bond system that ensures the payment of all present and future reclamation costs and, thereby, one that internalizes the costs of mining in a manner consistent with SMCRA.

*Cat Run Coal Co.,* 932 F.Supp. at 781 n. 17. In short, the government, and ultimately the public, should not act as an indemnitor for the operator who creates a long-term AMD problem by being required to release the surface miner's bond prematurely.

Second, the Director's position comports with the goal, admittedly sometimes difficult to achieve, of *preventing* AMD during the permitting and operating stages. As stated by the Defendants, "Faced with the prospect of having to treat acid mining drainage into perpetuity and with not having the reclamation bond released, an operator would rationally be motivated to ensure that the problem

a passive treatment system, gain release and the system could later fail, leaving the taxpayers and adjoining landowners with a burden contrary to the policy of cost internalization. Such a burden could not have been intended by Congress.

13. Plaintiffs also rely on a four-year old unpublished opinion from the Eastern District of Tennessee styled *Skyline Coal Company v. Office of Surface Mining Reclamation and Enforcement,* No. 3:93–0042 (E.D.Tenn. Feb. 3, 1993). The case is wholly distinguishable. In *Skyline,* four OSM experts had reviewed plaintiff's request to use limestone to alleviate AMD in seeps that some previous tests indicated had a high alkaline

content. All opined the plan should prevent AMD. Further, the "undisputed testimony of an imminently [sic] qualified expert ... was that the proposed [passive treatment method], without maintenance, would assure water meeting discharge compliance standards." Slip op. at 13. Ironically, the type of case-specific, considered analysis undertaken by the experts in *Skyline* to assure the non-occurrence of AMD largely would be foreclosed by the sweeping amendment proposed here. In any event, *Skyline* has no precedential value and is of little assistance to the Court in resolving this dispute.

of acid mine drainage does not arise." Defs.' memo. in supp. at 27.

As is apparent from circuit precedent discussing *Chevron*, the Court need not find the Director's interpretation is the only permissible construction he might have adopted or that it is the interpretation this Court would have reached on its own. The Court need only find the Director's understanding is sufficiently rational to preclude the Court from substituting its own judgment. As observed in *Warren* where "an agency charged with a statute's enforcement interprets the statute's textual ambiguities in such a way as to accommodate conflicting policies reasonably, a court must not disturb the agency's interpretation unless it runs counter to the statutory language or the legislative history." *Warren*, 65 F.3d at 391. Further, deference is appropriate especially when dealing with a complex scheme like SMCRA, where "the administrative authorities are far more able than this Court to determine congressional intent in the light of experience in the field." *Mowbray*, 914 F.2d at 599.

The balance in the Director's approach, consistent with congressional direction, is readily ascertainable. The Director begins with the proposition that complete prevention of AMD *during mining and reclamation* may not be possible and the associated environmental burden, with treatment, is judged tolerable resulting in a permit being issued. At this interim juncture, then, environmental considerations give way to the goal of maximizing coal production for the nation's energy requirements. Once an operator decides to close up shop and leave, however, it then would be inconsistent to allow the treatment guarantee to lapse, potentially saddling the taxpayers and adjoining landowners with a perpetual financial and environmental problem that should have been internalized by the operator. At this final stage, environmental considerations and cost internalization assume ultimate priority over the goal of maximization of production to require the total abatement of AMD.

The Director has thus struck a reasonable balance in the face of Congressional ambiguity and difficult, conflicting policy considerations. Given satisfaction of the *Chevron* inquiry, the Court is bound to defer to that interpretation.[14]

## B. Other Issues:

Plaintiffs raise two other arguments meriting consideration.[15] First, they assert the disapproval of the proposed amendment was inconsistent with OSM's own regulations for bond release. Second, they assert the disapproval was inconsistent with the CWA.

### 1. Inconsistency with OSM's own regulations

Plaintiff cites several OSM regulations in an attempt to show the Director has acted inconsistently with his own mandates. For the most part, however, Plaintiffs cite to regulations that add nothing to the inquiry of whether bond release may be subject to the Director's no-treatment policy. Admittedly, several of the cited regulatory provisions support the proposition that OSM regulations allow treatment as a means of achieving compliance with effluent limits. As previously discussed, however, that is not the issue under consideration. Plaintiffs rely in support on, among other provisions, 30 C.F.R. §§ 780.21(h) and 816.41(d), (f).

---

14. Plaintiffs also briefly assert that neither SMCRA nor its regulations contain provisions corresponding to WVCSR sections 38–2–2.20 or 38–2–12.2(e) and that, according to section 1255(b), section 38–2–2.20 cannot "be construed to be inconsistent" with the Act. 30 U.S.C. § 1255(b). The Court concurs with the Director, however, that he is not counseled to match up closely corresponding provisions in the state and federal programs and determine their precise consistency. Rather, the Director must act at a more general level, examining the amendment against the manner in which SMCRA is supposed to function and determining the proposed addition's consistency with SMCRA's language and goals. Any other interpretation would encourage a crafty draftsman to circumvent SMCRA easily.

In any event, while "chemical treatment" is not defined in SMCRA, the requirements for bond release are set forth. Plaintiffs' argument is rejected.

15. Plaintiffs have offered arguments in addition to the following two contentions addressed in detail. For instance, Plaintiffs assert the Director's decision improperly disapproves a regulatory standard that is more stringent than, and thus not inconsistent with, SMCRA. While the Court has considered these additional arguments, they lack merit.

Like the statutory interpretation above, however, it is not unreasonable for the Director to construe these regulations as dealing with ongoing compliance with water quality laws and not as addressing specifically when such compliance is *finally* sufficient for bond release. As recognized in *Shalala*, a reviewing court's "task is not to decide which among several competing interpretations best serves the regulatory purpose." *Id.* at 512, 114 S.Ct. at 2386. The Director's interpretation must be given controlling weight here because it is neither plainly erroneous nor inconsistent with the regulations cited. Similar to the *Chevron* review paradigm, "deference is all the more warranted when, as here, the regulation concerns 'a highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Shalala*, 512 U.S. at 512, 114 S.Ct. at 2387.[16] Based on these considerations, the Court rejects Plaintiffs' argument.[17]

## 2. Inconsistency with the CWA

SMCRA dictates none of its provisions are to be construed as superseding, amending, modifying or repealing the enforcement mechanisms contained in other federal environmental laws, including the CWA, "the State laws enacted pursuant thereto, or other Federal laws relating to the preservation of water quality." *See* 30 U.S.C. § 1292(a)(3). Plaintiffs assert the disapproval of the proposed amendment contravenes this prohibition because OSM's regulations do not, and cannot, prohibit release of a bond based on whether treatment is the means by which compliance is achieved. The argument is intricate.

Two components of the CWA are critical to understanding Plaintiffs' argument: EPA's effluent limitations and the National Pollutant Discharge Elimination System (NPDES) permitting program. Every mining operation in West Virginia must possess both a surface mining and reclamation operations permit and an NPDES permit. Under the CWA, an operator with an NPDES permit may discharge pollutants according to the effluent limits specified in the permit. Effluent limits are the conditions in an NPDES permit that specify the amount and character of discharge allowable from the operation.

The effluent limits for coal mines, cross referenced in OSM's regulations at 30 C.F.R.

---

**16.** Plaintiffs point to other provisions in an attempt to show inconsistency on the Director's part. The first is taken from OSM's preamble to its 1980 bonding regulation and a since-rescinded regulation emanating from it. Without engaging in a detailed analysis, suffice it to say neither the Court, nor apparently the Director, perceive the cited provisions with the same clarity urged by Plaintiffs. The second cited provision is more supportive of Plaintiffs. It is taken from a 1988 OSM observation concerning bond release where a mine is treating discharge. The provision appears to allow bond release when post-closure drainage requiring treatment is occurring *if* there are "assurances which provide through a contract or other mechanism enforceable under other provisions of law to provide, for example, long term treatment of . . . acid discharge." 53 Fed.Reg. 44356, 44361–62 (1988). Curiously, Plaintiffs do not use this excerpt to attack the Director's position head on. Rather, they assert that West Virginia's NPDES permit system constitutes a "mechanism enforceable under other provisions of law[.]" First, that question is largely academic here because West Virginia has not proposed formally a regulation that would accept the NPDES permitting process as a reliable assurance for bond release. Second, it does not appear the NPDES permitting process pro-

vides the same quantum of "assurances" discussed in the OSM document. In any event, while the Director's current position might be construed as being at odds with his predecessor's decade-old observation, the Court is unwilling to conclude the potential inconsistency is sufficient to overcome the usual deference accorded to an agency's interpretation of its own regulations.

**17.** Plaintiffs urge the Court to find a conflict between a statement in Defendants' brief and the Director's prior interpretation disapproving the proposed amendment. Plaintiffs' reading is strained; no conflict is present. Further, Plaintiffs have erected a straw man for their argument, pointing to the Defendants' statement in their brief that "Passive water quality treatment is designed to be a self-sustaining system that relies on chemical or biological processes that should require no external reagents, maintenance, or support." Defs.' memo. in supp. at 9. They neglect to note Defendants' caution in the two sentences that follow this statement: "The effectiveness of passive treatment systems, particularly over the long term, *has not been established. Ongoing maintenance and support of such systems is likely to be required.*" *Id.* (emphasis added).

§§ 816.42 and 817.42, are technology-based standards. That is, the standards are based on what level of water quality a particular treatment technology can achieve. The specific standards for the coal mining "point source" category are found at 40 C.F.R. part 434. According to Plaintiffs, and not contested by Defendants, the standards are divided into three separate phases: (1) discharges from active mine areas; (2) discharges from postmining areas; and (3) discharges from abandoned mine areas. Different effluent limitations apply to each phase. The latter two categories are the most important for present purposes.

The postmining effluent limitations apply to "discharges from reclamation areas until the performance bond issued to the facility by the appropriate SMCRA authority has been released." 40 C.F.R. § 434.52. An "abandoned mine" means a mine where mining operations have occurred in the past and (1) the applicable reclamation bond has been released or forfeited; or (2) if no reclamation bond or other financial assurance has been posted, no mining operations have occurred for five years or more. According to Plaintiffs, the abandoned mine phase effluent limitations are established on a permit-by-permit

basis based upon the best professional judgment available.

Plaintiffs point to two preambles in support of their argument. The first is a preamble to OSM's rule on hydrology, which made note of the EPA's and its state counterparts' authority to set discharge standards applicable both prior to and after bond release.[18] The second is a preamble to EPA's effluent limitation rulemaking.[19] Plaintiffs assert generally the EPA effluent limitations are based upon what water quality a particular treatment technology can achieve economically. Plaintiffs pose two arguments based on this premise. First, Plaintiffs query, how can an operator be required to meet a standard imposed by SMCRA of not using treatment to gain bond release when the standard of the operator's NPDES permit set by EPA and DEP is based on the premise he is using the best available treatment? Second, Plaintiffs assert the Director's no-treatment requirement imposes an arbitrary and prohibitively expensive standard that may be impossible to achieve. The Court rejects both arguments.[20]

■ Regarding the first argument, as posited by Defendants, Plaintiffs appear to suggest they will be perpetually "stuck" at

---

**18.** The two excerpts relied upon by Plaintiffs are as follows:

Paragraph (d)(1) [referencing 30 C.F.R. §§ 816.41(d) and 817.41(d)] requires operators to protect surface-water quality by minimizing the formation of acidic or toxic drainage and by preventing, to the extent possible using the best technology currently available, the contributions of suspended solids to streamflow outside the permit area and by otherwise preventing water pollution. If reclamation and remedial practices are not adequate to meet the requirements of §§ 816.41 and 816.42, then water-treatment facilities or water-quality controls must be used.

.    .    .    .    .    .

Under either OSM or EPA rules any point source that exists either prior to or after removal of sedimentation ponds must comply with EPA effluent limitations until bond release. After bond release, applicable effluent limitations may be established on a permit-by-permit basis by the National Pollution Discharge Elimination System (NPDES) permitting agency.

48 Fed.Reg. 43956, 43978 (1983); 48 Fed.Reg. 44032, 44048 (1983).

**19.** The relevant excerpt provides as follows:

EPA's coal mining effluent limitations apply until release of the reclamation bond required by SMCRA. Today's regulation will not change that requirement. However, in response to a concern expressed by one of the petitioners, the Agency wishes to reemphasize that post-bond release discharges are subject to regulation under the Clean Water Act. If a point source discharge occurs after bond release, then it must be regulated through an NPDES permit under sections 301(a) and 402 of the Clean Water Act. If the responsible party does not obtain a permit, then it is subject to enforcement action by EPA under section 309 of the Act and by citizens under section 505(a)(1) of the Act. Appropriate case-by-case effluent limitations would be established in the NPDES permit for such a discharge.

50 Fed.Reg. 41296, 41298 (1985).

**20.** Perhaps recognizing the weaknesses of these two arguments, Plaintiffs shifted gears in their response brief. They craft, *inter alia*, an assertion relying upon the doctrine of *expressio unius est exclusio alterius*. Defendants' reply adequately disposes of these additional arguments.

phase two because they will not be permitted to use treatment to gain bond release. This possible result, however, does not contravene the CWA. It is true that the CWA permits point sources in phase two to use various treatment technologies. It says nothing, however, about how operators move through the three phases nor what may and may not be done to gain bond release. The Court agrees with the Defendants that this determination is left to SMCRA and the Director. Indeed, pursuant to 30 U.S.C. §§ 1265(b)(10) and 1269(c)(3), the Director has an independent responsibility to assure the protection of the hydrologic balance and ensure full reclamation of the permitted site. In sum, regulating effluent discharges and setting reasonable conditions for bond release are two separate considerations, and the Director's interpretation does nothing to alter the effluent limitations.[21] Neither does it prohibit the use of chemical or other treatment for meeting the limitations.[22] Accordingly, the Court rejects the argument.[23]

Plaintiffs' second assertion, basically contained in two sentences of its forty-six (46) page brief, is that the no-treatment requirement imposes an arbitrary and prohibitively expensive standard that may be impossible to achieve. In support, Plaintiffs cite only an unpublished decision, nearly two decades old, from another district in another circuit. Second, the factual circumstance at hand is distinguishable from that in the cited case. Even were not Plaintiffs' argument on somewhat shaky legal footing, Plaintiffs failed to demonstrate that continued treatment and withholding release of the performance bond is " 'prohibitively expensive' " or otherwise imposes an impossible standard. Pls.' memo. in supp. at 35 (quoting *In re Permanent Surface Mining Regulation Litig.*, 19 ERC 1477, 1487 (D.D.C. May 16, 1980), *aff'd*, 653 F.2d 514 (D.C.Cir.1981), *cert. denied*, 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981)). Accordingly, Plaintiffs' argument fails.

## V. CONCLUSION

The Court does not disagree that section 1265(b)(10) endorses treatment as a method of lessening the effects of AMD; that is an entirely different proposition, however, from releasing an operator from its bond with only a bare assurance of, for instance, a limestone drain acting as a filter against serious environmental damage.

The proposed amendment is inconsistent with SMCRA and less effective than the

21. The importance of bond release cannot be underestimated. Once release occurs, and post-release discharge of AMD commences, the public is put in a difficult position regardless of the availability of civil or criminal penalties. While effluent limitations will be set for those operators gaining release, some operators may cease business altogether, disappear or become insolvent. Once this occurs, the effluent limitations have little utility. The bond provides a significant guarantee against this eventuality. Further, Plaintiffs do not dispute Defendants' assertion that while a released operator may be required to obtain an NPDES permit for post-release discharge, "such a permit might not be issued immediately, so that water could remain untreated for an indefinite period of time." Defs.' reply at 7 n. 4.

Post-release discharges are especially serious when one considers another of Defendants' assertions, again not challenged by Plaintiffs, that once SMCRA jurisdiction is terminated the monies in West Virginia's Special Reclamation Fund may no longer be available to cover costs of continuing AMD treatment. The Fund apparently may only be used to reclaim sites for which the performance bond has been forfeited, rather than released. W. Va.Code 22–3–11(g).

22. Plaintiffs' selectively quoted preambles in their brief did not tell the whole story. For instance, just six pages beyond the quoted passage in footnote 16 appears the following language: "These results, coupled with the fact that the release of bond by SMCRA authorities signifies their determination that post-mining pollution problems are *abated* and can be reasonably expected not to recur, indicate that a need for nationally applicable regulations for discharges after bond release currently does not exist." 50 Fed.Reg. at 41304 n. 8 (emphasis added). Contrary to Plaintiffs' assertions, this language indicates EPA regulations presume there will be no more discharges requiring an NPDES permit or requiring the continuing use of treatment once the SMCRA regulatory authority has determined bond may be released.

23. Defendants argue in the alternative the lack of a bonding requirement in the CWA or its West Virginia counterpart constitutes a legislative "gap" which SMCRA may fill. While the argument is persuasive, *see In re Surface Mining Regulation Litigation*, 627 F.2d 1346, 1367 (D.C.Cir.1980), the Court need not rule, given its disposition on other grounds.

522

federal Act's implementing regulations. It is also, however, curious from a policy standpoint. In essence, it would encourage an operator to use a perhaps less effective passive treatment method over a more aggressive active course. The Court shares the Director's concerns about the efficacy of the proposed amendment.

The Director's decision was made in accordance with *Chevron* and *Shalala* and was not arbitrary, capricious, or otherwise inconsistent with law. His determination is thus entitled to deference from the Court. Plaintiffs' arguments to the contrary are unavailing.

Accordingly, the Court (1) **GRANTS** Defendants' motion for summary judgment; (2) **DENIES** Plaintiffs' motion for summary judgment; (3) **DENIES** as moot Defendants' motion to dismiss Count VII; and (4) **GRANTS** Defendants' motion for leave to exceed the page limitation.